## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| HERITAGE CAPITAL CORPORATION, ) <br> HERITAGE AUCTIONEERS & ) <br> GALLERIES, INC., HERITAGE ) <br> NUMISMATIC AUCTIONS, INC., ) <br> HERITAGE AUCTIONS, INC., HERITAGE ) <br> VINTAGE SPORTS AUCTIONS, INC., ) <br> CURRENCY AUCTIONS OF AMERICA, ) <br> INC., and HERITAGE COLLECTIBLES, ) <br> INC., ) <br> ) <br>     Plaintiffs, ) <br> ) <br>   vs. ) <br> ) <br> CHRISTIE'S, INC. and COLLECTRIUM, ) <br> INC., ) <br> ) <br>     Defendants. ) | Case No.: _____ <br><br> **(JURY DEMAND)** |

## COMPLAINT

Plaintiffs Heritage Capital Corporation ("HCC"), Heritage Auctioneers and Galleries, Inc. ("HAGI"), Heritage Numismatic Auctioneers, Inc. ("HNAI"), Heritage Auctions, Inc. ("HAI"), Heritage Vintage Sports Auctions, Inc. ("HVSAI"), Currency Auctions of America, Inc. ("CAA"), and Heritage Collectibles, Inc. ("HCI") (sometimes referred to collectively as "Heritage"), by their undersigned counsel, for their Complaint against Defendants Collectrium, Inc. ("Collectrium") and Christie's, Inc. ("Christie's", collectively "Defendants") allege as follows:

## INTRODUCTORY STATEMENT

1.    Recently, Christie's sent an email to its customers inviting them to subscribe to

"an innovative and easy-to-use, searchable database with millions of auction results", which it called Collectrium Market Data Beta.  Christie's stated that Collectrium Market Data Beta contains "7 million+ sales results", and that it was a "proprietary database, specially created by Collectrium".  Christie's urged its customers to "be among the first to access this exceptional tool for positioning your collection in the marketplace."

2.      The only thing "exceptional" about the content on Christie's Collectrium site is the manner in which Christie's compiled it, namely through the surreptitious and unlawful theft of huge volumes of Plaintiffs' proprietary and copyrighted auction data, photographs and text from Plaintiffs' servers.  As of the filing of this Complaint approximately 2.7 million of the 11+ million listings on Defendants' site were stolen from Plaintiffs.

3.      Christie's is using Collectrium to sell Plaintiffs' original, copyrighted material as Christie's own, and to divert customers from Plaintiffs, misleading collectors into thinking Christie's is knowledgeable and experienced in auction categories in which Plaintiffs, in fact, are the clear marketplace leader.

4.      This lawsuit seeks a judgment enjoining Defendants from further theft of Plaintiffs' content, requiring Christie's to shut down Collectrium until all stolen content has been expunged, and awarding each of the Plaintiffs damages.

## THE PARTIES

5.      Plaintiff HCC is a Texas corporation founded in 1976 with principal offices in Dallas. HCC, its subsidiaries, and affiliates, including Plaintiffs HAGI, HNAI, HAI, HVSAI, CAA, and HCI all operate under the d.b.a. "Heritage Auctions" ("Heritage"). Heritage is the largest auction house in the world founded in America, the third largest auction house in the world overall, and operates auctions in approximately 40 different categories.

6.      Christie's, Inc. is a New York corporation with a principal office at 20 Rockefeller Plaza, New York, New York 10020. Christie's operates an auction business that competes with Heritage. Christie's claims to be the largest auction house in the world.

7.      Collectrium, Inc. is a Delaware corporation, incorporated in 2009, with its principal office in New York. Collectrium is wholly owned by Christie's, Inc.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction of this action pursuant to 28 USC §1331.

9.      This Court has personal jurisdiction over each Defendant pursuant to the Texas long-arm statute codified in Texas Civil Practice & Remedies Code §17.042. Defendants transact business in Texas.  Moreover, Defendants have specifically accessed and targeted Heritage's website, owned and maintained by Heritage in Dallas, Texas, and have agreed to the terms and conditions of the Heritage website that provide for application of Texas law.

10.      Venue is proper in Dallas County, Texas because the events that gave rise to this Complaint occurred, and are continuing to occur, in Dallas County within this Judicial District and witnesses thereto reside therein.

## FACTS

11.      Heritage is the leading auction house in multiple collectibles categories, including rare coins and currency, entertainment memorabilia, sports memorabilia, comic books and comic art, natural historical items, and many other traditional auction categories.  In the above categories, Heritage's sales are many times greater than those of Christie's or of any other auction house.

*Plaintiff's Website, www.HA.com*

12.     HCC owns and operates the website www.ha.com ("HA.com"), the leading site for the purchase, sale and auction of collectibles. Through HA.com, Heritage offers online-only auctions, displays catalogues for its many live auctions in dozens of categories of collectible items, and offers many client services and otherwise advertises its business. Heritage has invested substantial time and more than $20 million over many years in developing its proprietary computer system and website, in addition to the vast sums it has expended to generate the original content contained therein.

13.     Heritage has developed a substantial amount of goodwill and its success and valuable reputation is in no small part due to its original innovations and position at the forefront of using the internet and technology in the auction and collectibles industries.

14.     The centerpiece of HA.com is the original content offered by Heritage to customers and potential customers.  Heritage offers images, taken by Heritage employees and independent contractors engaged by Heritage, of every item offered for sale, or sold previously, at a Heritage auction since 1993, comprising over 8 million original images.  HA.com typically also offers detailed descriptions, written by Heritage employees and independent contractors engaged by Heritage, of every such item.  These descriptions encompass not only the physical characteristics of the items, but also their history and provenance, and Heritage's opinions regarding the quality of particular items vis à vis other specimens of the same item, or items' significance within the category in which they are being sold.  This compilation of visual and textual content for millions of individual items provides HA.com users with a unique experience and is central to Heritage's business.

15.     For example, one such item is a 1792 P1C Birch Cent, Judd-5, Pollock-6, R.8 MS61 Brown NGC sold by Heritage in August 2016 ("Birch Cent") (attached herein as Exhibit

A). The Birch Cent entry on HA.com shows four original photographs, two videos, and a thirteen-paragraph original description that details the coin's history, identifies its prior owners, and explains its significance as a collectible. Above and to the right of the images of the Birch Cent on HA.com are notices that the user must sign in or create an HA.com account to see the price for which the Birch Cent was sold. At the very bottom of the Birch Cent entry, the user is similarly notified that only with an HA.com account may they see previous prices this item was sold for at Heritage, as well as obtain a price and population guide.

16.    Another example is the Prince Owned and Played Custom Made Signature Yellow Cloud Guitar sold by Heritage in June 2016 ("Yellow Cloud Guitar") (attached herein as Exhibit B). Similarly to that of the Birch Cent, the Yellow Cloud Guitar original description (paired with original photographs and videos) is a unique and creative work, compiling facts and images pertaining to the item itself with an original narrative of the historical context in which this item originated, its significance over time and its place in the current memorabilia marketplace.

17.    HA.com offers users an archive of all items auctioned by Heritage since 1993, typically including images of the respective items taken by Heritage employees, and detailed descriptions and opinions of the items prepared by expert specialists employed by Heritage for that purpose. This content is the unique product of Heritage, containing both creative elements written by Heritage employees and the results of significant research by Heritage regarding the history of the item, and of other items that are similar in time, type, significance, and design. The above-described content is unique to Heritage's website.  No other auction house or other participant in the collectibles marketplace offers even a fraction of the images or written content provided by Heritage on HA.com.   Users can see photographs and scholarly text about a

particular item offered for sale, review past sales of that item or items similar to it, and compare the current item with the past items to assist them in assessing value and historical market trends, as well as to see where an item they might own fits within the marketplace in that collectibles category.

18.     These millions of individual compilations of content generated by Heritage for each present and archived past Heritage auctioned item, are copyrighted works, and are each identified as such on each and every page of the HA.com website through display of an appropriate copyright notice.  In addition, Plaintiff HCC registered its copyright in the website and individual archived listings in Reg. TX 7-451-606 (2009) and HCC's copyrights in descriptions, photographs from catalogs that were eventually incorporated into the HA.com website in Reg. TX 7-622-294 (2012), TX 7-609-889 (2012), TX 7-612-006 (2012), and TX 7-611-965 (2012). Plaintiff HAI registered its copyright in the website and archived listings in Reg. VA 1-695-279 (1995), and TX 7-015-793 (2008). Plaintiff HNAI registered its copyright in additions to the archives and individual listings in Reg. TX 6-443-330 (1995), TX 6-521-427 (2003), TX 6-521-423 (2003), TX 6-521-424 (2004), TX 6-443-325 (2004), TX 6-443-328 (2004) TX 6-443-329 (2004), TX 6-521-428 (2005), TX 6-443-326 (2005), TX 6-443-327 (2005), TX 6-443-328 (2005), TX 6-521-426 (2005), TX 7-744-937 (2012), TX 7-653-598 (2012), TX 7-877-435 (2012), TX 7-692-230 (2012).  Plaintiff HAGI registered its copyright in additions to the archives in Reg. TX-7-738-112 (2012) and TX 8-223-043 (2016).

*HA.com Website Use Agreement*

19.     All registered users of HA.com must agree to the terms of a Website Use Agreement in order to register.  The Website Use Agreement contains, inter alia, the following provisions:

**Statement of Ownership**

The Website is solely and exclusively owned and maintained by Heritage, including but not limited to rights, title, interests, trademarks (registered or not), copyrights (registered or not), database rights, rights of authorship, trade secrets, sui generis, and all intellectual property and proprietary rights. Heritage is the exclusive owner of all Website content, appearance, organization, and underlying software, code, and stored data, including but not limited to images, descriptions, text, prices realized lists, articles, logos, audio and video. Your visitation to the Website, or usage of any features therein, does not grant You ownership of any feature or content contained therein.

**License for Limited Uses**

The Website and its contents, features, and services are available for use only if You have the legal capacity to form contracts under applicable law. You agree to all applicable laws and regulations regarding visitation to, and usage of, the Website. You may copy or print content only for Your personal use, and services are available only for Your personal use. One individual image may be used to accompany any article that You write without our written consent, if not used for commercial purposes, and if credited to Heritage Auctions.

**Prohibited Website Uses**

You may not republish, commercially distribute, duplicate, or exploit any aspect of the Website, either code or content. Other than the Fair Usage specified in the License for Limited Uses, You may not download, reproduce, modify, distribute, transfer, sell, or create derivative works of any code, contents, data, whether specifically copyrighted or not. Any unauthorized usage of the Website may subject You to civil or criminal prosecution. By accessing the Website, You agree not to: attempt to gain unauthorized access to any programs, code, systems, or data through any means, on any server or database used on the Website;

    a.  engage in any collection of data, through such practices as "screen scraping," "database scraping," "robot," "spider" or other automatic means;

    b.  attempt to gain unauthorized access to catalog information and descriptions, images, email addresses, or contact information of any kind;

    c.  use the Website or its contents or code in violation of our intellectual property or proprietary rights;

    d.  make any attempt, or support any attempt, to reverse engineer, decompile, disassemble, or in any manner attempt to ascertain any code supporting the Website and its services;

    e.  attempt to insert any content, materials, advertising, or business content into this Website, on behalf of yourself or any other party, or to copy any aspect of this Website's content, services, descriptions, images, or code into any other Website

for commercial or malicious purposes, or to distribute any such content for commercial gain;

f.   attempt to gain unauthorized access to this Website or network, or any other website or computer network through this Website;

g.   remove, or attempt to remove any "watermark" on any image which demonstrates the source of the image; and

h.   attempt any actions whatsoever that could serve to overburden, interrupt, slow, alter, damage, or disable the Website, or impair in any manner the Website's ability to deliver its services and content, including but not limited to such malicious practices as sending mass messages or "flooding" systems and servers with requests, data, or similar communications.

20.     Upon creation of a HA.com account, a registered user is again notified of the terms and conditions of use and must affirmatively agree to abide by them.

21.     Upon registering with HA.com, a user may see, in addition to these images and written descriptions, the price at which the items were previously sold. The HA.com sales archive allows a user to see the past performance of an item, as well as easily identify similar items that have been sold and that may complement the user's collection or otherwise indicate the potential sales price the user's collection will realize.

22.     HA.com also offers additional services to HA.com users, including but not limited to auction estimates, collection appraisals for insurance or tax purposes, collection management, etc.

*Heritage marketing to HA.com account users*

23.     HA.com contains the My Collection service, wherein online users may enter information about their collectibles collection. The My Collection service assists users in organizing their collections, and also is of great value to Heritage. First, My Collection identifies potential future bidders and consignors to Heritage's auctions. Also, My Collection allows Heritage to tailor its advertising to users based on the user's areas of interest and existing collection. By operating the My Collection service, Heritage also obtains information whereby it

may evaluate the market of various collectibles categories, identifying who has significant collections and may be likely to require auction services in the future.

24.     Heritage further benefits from operating My Collection in that users are more likely to seek services, such as auction appraisals, through Heritage because more of the information about the items they collect is already available on HA.com and therefore making such a request is easier for the collector. Increased numbers of auction appraisals then increase the likelihood that appraisals will lead to consignments of material to Heritage.

25.     My Collection also offers an option for the user to make items from their collection public to be viewed by other HA.com members, who can then anonymously offer to buy the items. This service incentivizes HA.com members to enter information about their collection on the HA.com website and incentivizes other HA.com members to spend more time on HA.com "shopping", to which members Heritage advertises extensively.

26.     HA.com also offers account users additional services, including but not limited to My Wantlist, where users may enter criteria of items they are looking to acquire and Heritage will pull past sales of items that meet the entered criteria, as well as notify the user when new matching items come up for sale. Heritage benefits from operating the My Wantlist service in that it allows Heritage to not only market more effectively to potential customers by highlighting exactly what they are looking for, but it also allows Heritage the opportunity to evaluate what items are in greater or less demand based on the wantlists of all HA.com account users.

*Theft of HA.com Content by Defendants*

27.     In July 2016, Heritage first determined a "spider" was operating on its website. A "spider" is a type of crawling, or scraping, software utilized by a third party which permeates a website and copies information off of all the pages of the website. "Spidering" and other website

crawling/scraping software allows a third party to obtain copies of all of the content off of the website at a superhuman speed, without actually viewing the web pages. (Spiders are named such because they branch out in multiple directions, or legs, scraping from a number of pages after entering the website through one page.)

28.     Spiders, and other crawling/scraping software are damaging to a website in several ways: 1) they can overwhelm a website by appearing to be a great number of users accessing many pages at once, limiting the websites' performance for legitimate users; 2) they allow third parties to steal large amounts of information and content before steps can be taken to shut down the spiders' access.

29.     Heritage traced the spider to an HA.com account under the name of Leanne Wise of Boiling Springs, SC ("the Wise Account"). That account was set up from the same computer as another HA.com account in the name of David La Cross, Director of Product Development at Defendant Collectrium ("the La Cross Account"). The computer used to register an account may be verified using the Guaranteed Unique Identifier ("GUID") which is an identification number unique to every computer. The La Cross account accessed HA.com using an IP address associated with Defendant Christie's.

30.     Heritage uses technological means to protect its HA.com site from intrusions. Among other things, Heritage instructs its system to send alerts to Heritage's IT personnel whenever there is unusually high traffic on HA.com originating from a single IP address or customer account. Heritage personnel can then investigate the situation to determine whether the activity has been authorized by Heritage, and if not block the IP address and/or suspend the customer's account. Defendants' randomization of the IP addresses they used to access HA.com circumvented those protections, permitting Defendants to access HA.com multiple times before

any alerts were generated, and hindered Heritage's ability to block future accounts created by Defendants which would then engage in further scraping.

31.     Over the course of nine  days, the Wise account accessed the HA.com website over 186,000 times. Based on the speed and length of time spent on each page, and the fact that the account's IP address was periodically randomized to different locations around the world to circumvent Heritage's protective systems (a tactic known as IP address randomization), Heritage had difficulty identifying the source of the activity, but eventually identified this behavior as that of a spider and that it originated in the Wise account.

32.     Once Heritage identified that the Defendants' spider was accessing HA.com through the Wise account, Heritage closed that account, thereby cutting off access to some parts of HA.com. Closing the account, however, did not block Defendants' spider from continuing to steal the copyrighted descriptions and images of items sold in past auctions from areas of HA.com that Defendants had already accessed.

33.     Heritage has identified 31 accounts operating Defendants' spider on the HA.com site, many of which can be identified on their face as using false identification, such as the account created by "Jason Bourne of Kathmandu" ("the Bourne Account"). The Bourne account again operated as a spider and accessed the HA.com account over 131,000 times within 18 hours. Heritage has identified that Defendant's spider has been operating on HA.com since as early as March, 2016. Heritage has suspended all of these accounts that it has been able to identify.

34.     Defendants' Spider spidered the HA.com website without logging into an HA.com account first, to identify the pages containing archived auction sales information, including spidering search pages which contained links to the auction sales item pages. Defendants' Spider then logged into Defendants' HA.com accounts to scrape the auction sales

information previously identified.

35.     At the time of filing this Complaint, Defendants' Spider has used those 31 accounts to access approximately five  million pages of the HA.com website and all the content contained therein.  Upon information and belief, Defendants are continuing to scrape HA.com, having posted stolen Heritage content as recently as November 19, 2016.  Defendants use of multiple fake accounts and IP randomization have frustrated Heritage's efforts to identify, and block, Defendants' scraping activity.

*Christie's and Collectrium's Fraudulent Business Model*

36.     Collectrium claims to offer inventory management services for collectors. Members create accounts on the Collectrium website wherein each individual collector may input information about the items in their collection so that all information is organized and stored on the cloud. Such information may include documents regarding insurance, provenance, where an item is currently on loan, conservation work, etc. Collectrium offers a range of memberships, costing from $90 to $400 and more per month.

37.     In fact, Collectrium operates as a "Trojan horse", intended to bring auction business to Christie's.  Accordingly, Collectrium also offers services in direct competition with those offered to HA.com members, including assisting their members in obtaining certain services and facilitating sales. For example, a member of Collectrium can identify an item in their collection they would be interested in selling, identify their asking price and Collectrium will market it to collectors with similar taste. Similarly, members may request an auction estimate for certain pieces and Collectrium will take information already uploaded about those pieces and share it with Christie's in order to obtain an auction estimate.

38.     Collectrium's primary attraction to potential customers is its advertised

compilation of millions of data and item descriptions from past auctions.  This database is only accessible to those with a Collectrium account. At the time of filing this Complaint, over 11 million such auction item descriptions were available on Collectrium's website.  Of these, more than 2.7 million were stolen from Heritage through the spidering described above.

39.     The Heritage listings on Collectrium's website add significant value to the Collectrium service because a user can see the past auction performance of items in their collection, as well as sales of similar items. This not only promotes future sales but, in theory, is utilized by the collector to value the pieces they already have in anticipation of future consignments.  Collectrium promotes the size and scope of its website content extensively in its advertising.

40.     Collectrium represents to potential customers that it operates independently from Christie's, and that it will not share any member's information with Christie's without the member's prior consent.

41.     In fact, Collectrium contacts Christie's immediately when anyone creates a Collectrium account. By creating a Collectrium account, a user lets in the "Trojan horse" and, without notice or granting permission, is provided with a Christie's account as well, evidencing that Collectrium has shared, at least, the individual's email address, Collectrium password, and answers to security questions with Christie's.

42.     Likewise, when an individual requests services through Collectrium, such as an auction estimate, Collectrium states that it will consult independent experts, but actually only seeks such services from Christie's. Collectrium recently began advertising its services in facilitating loans secured against pieces in a Collectrium member's collection. Presumably Christie's is the auction house through which pieces will be sold in the event the collector

defaults on these loans or otherwise decides to sell the piece.

43.     Christie's uses Collectrium's website to acquire potential consignments and to advertise its upcoming auctions. Collectrium advertises items in Christie's upcoming auctions to its members tailored specifically to what items the Collectrium member already owns. Christie's is always the first auction house to have an opportunity to give an auction appraisal to a potential consignor when that consignor is a Collectrium member, and Christie's intention is to obtain the consignment without the Collectrium member consulting any Christie's competitor, including Heritage.

44.     Collectrium is therefore especially valuable to Christie's in the collectibles categories in which Christie's is not the marketplace leader because a Collectrium member whose collection spans multiple categories is more likely to consign all items to Christie's despite the fact that in some categories another auction house, in many cases Heritage, is the market leader.

*Defendants' Use of Stolen Material from Heritage*

45.     As of August 31, 2016, approximately 150,000 out of seven  million listings on Collectrium's Website had come from Heritage. By the time of filing this Complaint, Defendants have added additional stolen Heritage listings, such that approximately 2.7 million of the 11+ million total listings on Collectrium's Website at that time had been taken from HA.com as described above.

46.     Most of these Heritage-derived listings reproduce Heritage's proprietary and copyrighted images and descriptions for the items sold. See, for example, the screenshots from Collectrium's Website pertaining to the Birch Cent and Yellow Cloud Guitar, attached herein as Exhibits C and D, which copy Heritage's descriptions verbatim.

47.     For the most part, Defendants copy Heritage's content verbatim.  To the extent that Defendants edit Heritage's original content at all, it is to remove references to Heritage, such as where an item's description references Heritage having sold that item or a similar item in the past. In every case, Defendants remove Heritage's copyright notices from the content, and replace it with a copyright notice on behalf of "Collectrium, Inc., a Christie's company".  This editing appears to have been done deliberately to obfuscate the fact that the content was created by Heritage and not by Defendants, and to claim Heritage's original research, professional opinions, photography and other content as Defendants' own.

48.     In November and December 2016, Collectrium began offering auction listings in a new format which obscures to an even greater extent what content was created by Collectrium and what is Heritage's copyrighted work, by describing the stolen Heritage content as "additional information" about the piece. See Exhibit E attached herein. Collectrium's new format also offers pictures and links to text relating to "similar items" to the listing a user is viewing. These "similar items" include individual items taken from multiple prior Heritage auction listings stolen by Defendants, and also listings from other auction houses such as Christie's itself.  This provides Christie's with yet another venue to promote themselves, in that even someone looking at a Heritage item may be directed to a "similar item" sold or being offered by Christie's.

49.     By appropriating Heritage's images and content, Defendants enable Collectrium members to view those images and content without actually visiting HA.com. This is especially valuable to Defendants in categories where Heritage is the leader in that auction category marketplace. For example, while Heritage content comprises approximately 24% of all listings on Collectrium's Website (at the time of filing of this Complaint), Heritage content comprises approximately 89% of Collectrium's Website in the coins and currency category, and 97% in the

comic books and trading cards categories, For those categories, Collectrium's site is, for all intents and purposes, a wholesale reproduction of HA.com, but devoted to taking business from Heritage and bringing it to Christie's.

50.     Individuals whose collections included items in such categories would be less likely to find value in a Collectrium membership as opposed to an HA.com membership (and therefore less likely to consign such items to Christie's) if Collectrium's Website did not offer Heritage's content, or if those individuals understood that Collectrium's millions of images and text descriptions were simply stolen from Heritage.

51.     Defendants' theft and use of Heritage's descriptions serves no purpose other than to (a) sell Collectrium subscriptions on the basis of Collectrium's purported "specially created" content without Defendants themselves having to incur any significant cost or effort to create their own content; (b) mislead the public as to Defendants' expertise and experience regarding collectibles, and thereby to attract potential Heritage consignors to Christie's.

*Harm to Heritage*

52.     Heritage has been harmed by the above conduct by Defendants behavior, including but not limited to the expenditure of time and resources to identify, trace, and block the dozens of fake accounts created by Defendants to steal Heritage property and hide their tracks, and the lost business and potential lost business resulting from Defendants' attempts to usurp Heritage's well-earned position as market leader in numerous collectibles categories to generate business for themselves.

53.     Defendants' deliberate efforts to hide their identity, including but not limited to programing their spider to randomly change its IP address on a frequent basis, resulted in huge time and effort being devoted to identifying and attempting to block future fake accounts and

spidering.

54.     Heritage has been harmed in that potential customers may view Heritage's original and copyrighted descriptions of items sold on the Collectrium website without having to visit HA.com. This deprives Heritage of the advertising opportunities that would occur if the individual were to visit Heritage's site. For example, when a user views a past sale on HA.com, similar items appear in the margins, allowing the user to immediately see Heritage's vast expertise and experience handling such items.  Customers are also invited to participate in My Collections and My Wantlist, to subscribe to Heritage publications, and to consign to Heritage's auctions.  Defendants have taken these advertising opportunities from Heritage by diverting customers from HA.com to Collectrium.

55.     That Collectrium's Website copies Heritage's descriptions, sometimes deliberately editing those descriptions to erase indicators of Heritage and always replacing Heritage's copyright notice with one from Defendants, deprives Heritage of recognition for having created the unique descriptions for its items. The millions of individual compilations of images and text created by Heritage are in themselves advertisements for future consignments to Heritage because they demonstrate the expertise and skill with which Heritage manages items consigned to their auctions, as well as Heritage's vast experience in actually selling such items. A Collectrium member viewing these compilations on Collectrium's site may believe Defendants' to have generated them, thereby according Defendants equal footing with Heritage that Defendants do not deserve.

56.     Collectrium's site also provides some information that is available to HA.com registered members only, including but not limited to the final price for which an item was sold. That this information is available on Collectrium's site may, over time, result in fewer persons

creating an HA.com account. Heritage's own growth and promotional efforts suffer as a result of the fewer HA.com accounts being created.

57.     Defendants identify Collectrium's site as "our proprietary database" indicating that all of the content contained in Collectrium's site rightfully belongs to Defendants, when in fact it was neither created nor purchased by Defendants.  Had Defendants requested a license from Heritage for this content, the price would have been in the millions of dollars.

58.     Defendants have told customers that improvements to Collectrium's site are "in beta test and will be fully released this quarter". Heritage does not know and has no control over how the "fully released" version will use the works stolen from Heritage, and expects that Defendants will conceive of more ways to exploit their ill-gotten gains, including the posting of the millions of Heritage copyrighted listings previously stolen by Defendants but which do not yet appear on Collectrium's site.

59.     Upon information and belief, Defendants, having had their fake HA.com accounts repeatedly suspended by Heritage, have now progressed to scraping Heritage's copyrighted works in a new manner. Defendants have continued to post Heritage's copyrighted listings on Collectrium's site. By November 2, 2016 Collectrium's site already included 345 listings of items sold by Heritage only two days earlier, namely on October 31, 2016, and Collectrium currently has information from Heritage sales as recent as November 19, 2016. Heritage is unable to identify and stop Defendants' latest methods of obtaining Heritage's copyrighted works.

## COUNT I
## COPYRIGHT INFRINGEMENT
### (17 U.S.C. §§ 106, 501)
(By Plaintiffs HCC, HAI, HNAI, HAGI, and HCI Against All Defendants)

60.     Plaintiffs reassert and incorporate by reference each and every allegation contained in paragraphs 1 – 59 above as if fully set forth herein and further alleges as follows:

61.     Defendants intentionally and willfully entered Plaintiffs' website using fraudulent information and, with blatant disregard for and intent to breach the Website Use Agreement, have infringed Plaintiffs' copyrighted works in violation of Sections 106 and 501 of the Copyright Act, 17 U.S.C. §§106, 501.  Defendants have used, and are using, the stolen content to sell access to the content to their customers, as well as attract auction business to Christie's.

62.     Defendants' acts of infringement are willful, intentional and purposeful, in disregard of and with indifference to Plaintiffs HCC's, HAI's, HNAI's, HAGI's, and HCI's rights. Defendants were notified each time an account was suspended and intentionally created a new account with false information rather than cease their unauthorized activity. Defendants deliberately programed their spiders to change IP addresses randomly to further obfuscate the origin of the unauthorized activity, delaying and increasing the costs associated with Heritage's ability to prevent continued scraping.  Defendants also edited the images and descriptions they appropriated from Heritage to remove references to Heritage that might inform Collectrium members that Heritage had created that content.

63.     As a direct and proximate result of said infringement by Defendants, Plaintiffs are entitled to actual damages in an amount to be proven at trial.

64.     In the alternative, Plaintiffs are entitled to statutory damages in an amount of $150,000 per infringed work pursuant to 17 U.S.C. §504(c).  For purposes of the statute, each Heritage item listed on Collectrium's site is a separate and distinct work infringed by

Defendants.

65.     Plaintiffs are further entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. §505 and otherwise according to law.

66.     As a direct and proximate result of the foregoing acts and conduct, Plaintiffs have sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. Plaintiffs are informed and believe and on that basis aver that unless enjoined and restrained by this Court, Defendants will continue to infringe Plaintiffs' rights in their original, copyrighted materials, will publish material previously stolen but which has not yet appeared on Defendants' website, and be unjustly enriched thereby. Plaintiffs are entitled to preliminary and permanent injunctive relief to restrain and enjoin Defendants' continuing infringing conduct.

## COUNT II
## VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT
### (18 U.S.C. §1030, *et seq.*)
(By Plaintiff HCC Against All Defendants)

67.     Plaintiff reasserts and incorporates by reference each and every allegation contained in paragraphs 1 – 59 above as if fully set forth herein and further alleges as follows:

68.     Heritage's computers are involved in interstate and foreign commerce and communication, and are protected computers under 18 U.S.C. §1030(e)(2).

69.     Defendants knowingly and intentionally accessed Plaintiff's computers without authorization and in excess of authorization as defined by Plaintiff's Website Use Agreement. Defendants were notified each time an account was suspended and intentionally created a new account with false information rather than cease their unauthorized activity.

70.     Defendants violated 18 U.S.C. §§1030(a)(2)(C) and (a)(4) by knowingly implanting spider data scraping software into Plaintiff's servers, collecting over five  million

pieces of copyrighted work, information and/or data belonging to Plaintiff HCC, and publishing that information on Collectrium's Website. Defendants intentionally caused damage to Plaintiff by burdening the computers and impairing the integrity of the copyrighted work, information and/or data.

71.    Defendants knowingly, willfully, and with an intent to defraud accessed Plaintiff's website by creating dozens of accounts using false identification and hiding the IP and other means of identification.

72.    Defendants exceeded their authorization on Plaintiff's website by using a spider software to scrape information and/or data from Plaintiff, and by publishing the stolen information and/or data on Collectrium's website. Defendants obtained content, information, and data of value from Plaintiff's computers and have realized value from their theft.

73.    As a result of these takings, Defendants' conduct has caused a loss to Plaintiff of at least $75,000 in value in real economic damages.

74.    As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to damages in an amount to be proven at trial.

75.    As a direct and proximate result of the foregoing acts and conduct, Plaintiff has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. Plaintiff is informed and believes and on that basis avers that unless enjoined and restrained by this Court, Defendants will continue to create false HA.com accounts to access and steal content, information and data belonging to Plaintiff for improper use by Defendants, will publish content previously stolen but which has not yet appeared on Defendants' site, and be unjustly enriched thereby. Plaintiff's remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling Plaintiff to remedies including

injunctive relief as provided by §1030(g).

## COUNT III
## VIOLATIONS OF THE DIGITAL MILLENNIUM COPYRIGHT ACT
### (17 U.S.C. § 1201, *et seq.*)
(By Plaintiffs HCC, HAI, HNAI, HAGI, and HCI Against All Defendants)

76.     Plaintiffs reallege and incorporate by reference each and every allegation contained in Paragraphs 1-59 above as if fully set forth herein and further alleges as follows:

77.     Heritage employs technological protections – including automated alerts for large amounts of traffic emanating from a single IP address or customer account, and additional safeguards – to protect Heritage's computers and servers from unauthorized access. These technological protection measures effectively control access to the copyrighted materials on Heritage's servers, and protect Heritage's exclusive rights in these copyrighted materials.

78.     Despite Heritage's best efforts to protect the HA.com site from Defendants' unauthorized access, Defendants circumvented Heritage's technological safeguards and gained unauthorized access to Heritage's copyrighted materials, including without limitation the copyrighted HA.com website, through the use of IP address randomization and the creation of dozens of fake HA.com customer accounts, in violation of 17 U.S.C. § 1201(a).

79.     In addition, Defendants have knowingly, and with the intent to facilitate and conceal infringement, (a) provided copyright management information that is false, namely that the content on Collectrium's website is Defendants' own copyrighted content; and (b) distributed copyright management information that is false, in violation of 17 U.S.C. §1202(a).

80.     In addition, Defendants have, without Plaintiffs' consent, (a) intentionally removed or altered Plaintiffs' copyright management information for content stolen by Defendants from HA.com; (b) distributed copyright management information knowing that the copyright management information has been removed or altered without Plaintiffs' authority, in

violation of 17 U.S.C. §1202(b).

81.   As a result of Defendants' wrongful acts, Plaintiffs have suffered, are continuing to suffer, and will continue to suffer damages to be proven at trial. Plaintiffs are further entitled to all profits attributable to Defendants' wrongful acts to be proven at trial.

82.   Alternatively, upon their election at any time before final judgment is entered, Plaintiffs are entitled to recover statutory damages from Defendants pursuant to 17 U.S.C. § 1203 (a) for each act of circumvention committed by Defendants in violation of 17 U.S.C. §1201 in the amount of not less than $200 or more than $2,500 per act of circumvention; (b) for each violation of 17 U.S.C. §1202 in the amount of not less than $2,500 or more than $25,000.   For purposes of the statute, each item is a separate and distinct circumvention under §1201 and/or violation under §1202.

83.   Plaintiffs are also entitled to an award of their reasonable attorney's fees pursuant to 17 U.S.C. §1203(b)(4).

84.   Defendants' circumventions also have caused Plaintiffs irreparable harm. Unless restrained and enjoined, Defendants will continue to commit such acts, including continuing to steal Plaintiffs' copyrighted material, publishing material previously stolen but which as yet has not appeared on Defendants' website, and being unjustly enriched thereby. Plaintiffs' remedies at law are not adequate to compensate it for these inflicted and threatened injuries, and thus Plaintiffs are entitled to injunctive relief as provided by 17 U.S.C. § 1203(b).

### COUNT IV
### HARMUL ACCESS BY COMPUTER
### (Texas Civil Practice and Remedies Code §§ 143.001, 143.002)
(By Plaintiff HCC Against All Defendants)

85.   Plaintiff reasserts and incorporates by reference each and every allegation contained in paragraphs 1 – 59 above as if fully set forth herein and further alleges as follows:

86.     Heritage's computers are owned by Plaintiff HCC and engaged in a business activity under Texas Penal Code §33.02(b)(1).

87.     Defendants knowingly and intentionally accessed Plaintiff's computers without effective consent as defined by Plaintiff's Website Use Agreement. Defendants were notified each time an account was suspended and intentionally created a new account with false information rather than cease their unauthorized activity.

88.     Defendants violated Texas Penal Code §33.02 by knowingly implanting a spider data scraping software into Plaintiff's computer servers, collecting over five  million pieces of copyrighted work, information and/or data belonging to Plaintiff, and publishing that information on Collectrium's website. Defendants intentionally caused damage to Plaintiff by burdening the computers and impairing the integrity of the copyrighted work, information and/or data.

89.     Defendants knowingly, willfully, and with an intent to defraud accessed Plaintiff's website by creating dozens of accounts using false identification and hiding the IP and other means of identification.

90.     Defendants exceeded their authorization on Plaintiff's website by using a spider software to scrape information and/or data from Plaintiff, and by publishing the stolen information and/or data on Collectrium's website.

91.     As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to damages in an amount to be proven at trial pursuant to Texas Civil Practice and Remedies Code §143.002 and otherwise according to law.

92.     Plaintiff is further entitled to its attorneys' fees and full costs pursuant to Texas Civil Practice and Remedies Code §143.002 and otherwise according to law.

93.     As a direct and proximate result of the foregoing acts and conduct, Plaintiff has

sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. Plaintiff is informed and believes and on that basis avers that unless enjoined and restrained by this Court, Defendants will continue to create false HA.com accounts to access and steal content, information and data belonging to Plaintiff for improper use by Defendants, will post material previously stolen but which as yet has not appeared on Defendants' website, and be unjustly enriched thereby. Plaintiff's remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling Plaintiff to remedies including injunctive relief.

## COUNT V
## TRESPASS
(By Plaintiff HCC Against All Defendants)

94.     Plaintiff reasserts and incorporates by reference each and every allegation contained in paragraphs 1 – 59 above as if fully set forth herein and further alleges as follows:

95.     Heritage is the legal owner of the website HA.com and all content on that website, including copyrighted works, information and data, and is entitled to possession of that content.

96.     Defendants intentionally and willfully entered Plaintiff's website using fraudulent information and, with blatant disregard for and intent to breach the Website Use Agreement, have taken control of Plaintiffs' property, namely the content described above, and have wrongfully exercised that control in a manner inconsistent with Plaintiffs' ownership of the property.

97.     Defendants have used HA.com content without permission to enrich their own businesses, depriving Plaintiff of its own resources. If not stopped, Defendants will continue and potentially increase their activities and perpetuate the risk that HA.com will experience malfunctions and be unable to provide proper service to legitimate users of HA.com, as well as

deprive HA.com of future legitimate users by making HA.com content and services available through Defendants.

98.     As a direct and proximate result of the trespass, Defendants' intentional and unauthorized access of the HA.com website has injured or interfered with Plaintiff's possession and use of its personal property.

99.     As a direct and proximate result of the trespass, Plaintiff has suffered damages and is entitled to damages in an amount to be proven at trial.

100.     As a direct and proximate result of the trespass, Plaintiff has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. Plaintiff is informed and believe and on that basis aver that unless enjoined and restrained by this Court, Defendants will continue to trespass upon HA.com to access and steal content, information and data belonging to Plaintiff for improper use by Defendants, and be unjustly enriched thereby. Plaintiff's remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling Plaintiff to remedies including injunctive relief.

**COUNT VI**
**UNFAIR COMPETITION**
(By All Plaintiffs Against All Defendants)

101.     Plaintiffs reassert and incorporate by reference each and every allegation contained in paragraphs 1 – 59 above as if fully set forth herein and further alleges as follows:

102.     Plaintiffs realize extensive value and benefits from the content, information and services available on HA.com. Plaintiffs create and own all original content and information available on HA.com. Plaintiffs realize additional benefits from the fact that the content and information available on HA.com is exclusively available on HA.com. Plaintiffs further realize additional benefits from the fact that users must create an HA.com account before viewing

certain information on HA.com.

103.    Defendant Collectrium competes with Plaintiffs in offering information and services also available to users of HA.com. Defendant Christie's competes with Plaintiffs in operating live and online auctions in similar categories of collectibles, and gains new bidders and consignors to their auctions through its ownership of Collectrium in the same manner in which Heritage gains new bidders and consignors to their auctions through HA.com account users.

104.    Defendants' intentional theft of HA.com content in order that Defendants may offer the content and information provided by HA.com on their competing websites is done intentionally to steal the value and benefits that Plaintiffs realize from its operation of HA.com and offering of original content, information and services to HA.com users.

105.    Defendants' actions constitute unfair competition in violation of Texas common law, for which Plaintiff is entitled to recover any and all remedies provided by such common law.

106.    Defendants have and will continue to realize substantial benefits from such unfair competition.

107.    As a direct and proximate result of the foregoing acts and conduct, Plaintiffs have sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. Plaintiffs are informed and believe and on that basis aver that unless enjoined and restrained by this Court, Defendants will continue to engage in unfair competition with Plaintiffs and be unjustly enriched thereby. Plaintiffs' remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling Plaintiffs to remedies including injunctive relief.

## COUNT VII
## CIVIL CONSPIRACY
(By All Plaintiffs Against All Defendants)

108.    Plaintiffs reassert and incorporate by reference each and every allegation contained in paragraphs 1 – 59 above as if fully set forth herein and further alleges as follows:

109.    Defendants willfully, intentionally, and knowingly agreed and conspired with each other to engage in the alleged wrongful conduct, and did the acts alleged pursuant to, and in furtherance of, that agreement and/or furthered the conspiracy by cooperating, encouraging, ratifying, or adopting the acts of the others.

110.    As a direct and proximate result of the acts in furtherance of the conspiracy, Plaintiff has suffered injury and Plaintiff is entitled to damages in an amount to be proven at trial, including disgorgement of Defendants' unjust enrichment.

111.    Defendants' intentional agreement to commit, and commission of, these wrongful acts was willful, malicious, oppressive, and in conscious disregard of Plaintiffs' rights, and Plaintiffs are therefore entitled to an award of punitive damages to punish their wrongful conduct and deter future wrongful conduct.

## COUNT VIII
## BREACH OF CONTRACT
(By Plaintiff HCC Against All Defendants)

112.    Plaintiff reasserts and incorporates by reference each and every allegation contained in paragraphs 1 – 59 above as if fully set forth herein and further alleges as follows:

113.    The Website Use Agreement is a valid and enforceable agreement binding on Defendants.

114.    The Website Use Agreement clearly states that Defendants will not:

You may not republish, commercially distribute, duplicate, or exploit any aspect

of the Website, either code or content … You may not download, reproduce, modify, distribute, transfer, sell, or create derivative works of any code, contents, data, whether specifically copyrighted or not … By accessing the Website, You agree not to:
attempt to gain unauthorized access to any programs, code, systems, or data through any means, on any server or database used on the Website;

    a.   engage in any collection of data, through such practices as "screen scraping," "database scraping," "robot," "spider" or other automatic means;

    b.   attempt to gain unauthorized access to catalog information and descriptions, images, email addresses, or contact information of any kind;

    c.   use the Website or its contents or code in violation of our intellectual property or proprietary rights;

    …

    h.   attempt any actions whatsoever that could serve to overburden, interrupt, slow, alter, damage, or disable the Website, or impair in any manner the Website's ability to deliver its services and content, including but not limited to such malicious practices as sending mass messages or "flooding" systems and servers with requests, data, or similar communications.

115.    Defendants have used the HA.com website.

116.    Upon use of the HA.com website, Defendants agreed to be bound by the Website Use Agreement.

117.    Defendants have breached the Website Use Agreement. Among other things, Defendants have employed spiders to copy and collect data off of HA.com. Defendants have used false identification to create HA.com accounts after their original HA.com accounts were shut down for improper use. Defendants have reproduced copyrighted information stolen from HA.com on their own websites in violation of Plaintiff's rights.

118.    Plaintiff has and will continue to be damaged as the result of Defendants' past and continued breach of the Website Use Agreement, in an amount to be proven at trial, including disgorgement of Defendants' unjust enrichment.

119.    As a direct and proximate result of Defendants' breach, Plaintiff has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. Plaintiff is informed and believes and on that basis avers that unless enjoined and restrained by this Court, Defendants will continue to breach the Website Use Agreement and be unjustly enriched thereby. Plaintiff's remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling Plaintiff to remedies including injunctive relief.

## JURY DEMAND

120.    Plaintiffs demand a jury trial.

WHEREFORE, Plaintiffs pray- for judgment against Defendants and each of them, jointly and severally, as follows:

1.    For statutory damages in the amount of

    a.   $150,000 for each infringement of Plaintiffs' rights under the Copyright Act,

    b.   $2,500 for each circumvention in violation of 17 U.S.C. §1201,

    c.   $25,000 for each violation of 17 U.S.C. §1202,

    d.   or as otherwise permitted by law.

2.    For actual damages suffered by Plaintiffs, in an amount to be proven at trial.

3.    For a preliminary injunction ordering Defendant Collectrium to shut down its website until such time as all content acquired from Plaintiff's website HA.com is removed.

4.    For a preliminary and permanent injunction prohibiting Defendants, and their respective agents, employees, officers, successors, licensees and assigns, and all persons acting in concert or participation with each or any of them, from any of

the following:

a.   Accessing any HA.com account website using false information or robotic scraping software, including but not limited to, spiders;

b.   Continuing to infringe Plaintiffs' copyright in the Infringed Works;

c.   Selling, distributing, publishing, or using any property obtained from the HA.com website, including but not limited to Plaintiff's copyrighted works, auction item descriptions, auction item sales prices, images, information, and data;

d.   Removing, downloading, or copying property from the HA.com website without Plaintiff's authorization, including but not limited to Plaintiff's copyrighted works, auction item descriptions, auction item sales prices, images, information, and data; and

e.   Otherwise engaging in acts of unfair competition and interference with Plaintiff, Plaintiff's customer relationships, the HA.com website, and Plaintiff's relationships with any account holder of an HA.com account.

5.   For an Order directing Defendants to return or destroy all copies in their possession of Plaintiff's property, including but not limited to, Plaintiff's copyrighted works, auction item descriptions, auction item sales prices, images, information, data and all other content taken from the HA.com website.

6.   For disgorgement of Defendants' gains and unjust enrichment.

7.   For prejudgment interest according to law.

8.   For punitive damages in an amount to be determined at trial on the basis of their willful and deliberate unauthorized computer access, copyright infringement,

computer fraud and conspiracy.

9.      For Plaintiffs' attorneys' fees, costs, and disbursements in this action.

10.     For such other and further relief as the Court may deem just and proper.

Dated: December 9, 2016                 By:   *s/Mark W. Bayer*
                                              Mark W. Bayer
                                              BARNES & THORNBURG LLP
                                              2100 McKinney Avenue, Suite 1250
                                              Dallas, TX 75201
                                              Telephone:  (214) 258-4101
                                              Facsimile:  (214) 258-4199
                                              E-mail: Mark.Bayer@btlaw.com

                                              Armen R. Vartian (*admission pro hac vice
                                              requested*)
                                              Laura C. Tiemstra (*admission pro hac vice
                                              requested*)
                                              LAW OFFICES OF ARMEN R. VARTIAN
                                              1601 N. Sepulveda Blvd., #581
                                              Manhattan Beach, CA 90266
                                              Telephone:  (310) 372-1355
                                              Facsimile:  (866) 427-3820
                                              E-mail:  armen@vartianlaw.com
                                              E-mail:  laura@vartianlaw.com

                                              **ATTORNEYS FOR PLAINTIFFS**

DMS 4525647v1