UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| HERITAGE CAPITAL CORPORATION, HERITAGE AUCTIONEERS & GALLERIES, INC., AND HERITAGE NUMISMATIC AUCTIONS, INC., HERITAGE AUCTIONS, INC., HERITAGE VINTAGE SPORTS AUCTIONS, INC., CURRENCY AUCTIONS OF AMERICA, INC., HERITAGE COLLECTIBLES, INC. | ) ) ) ) ) ) ) ) | Case No.: 3:16-cv-03404-N |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| CHRISTIE'S, INC. and COLLECTRIUM, INC., | ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
AND MEMORANDUM IN SUPPORT THEREOF**

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................ 1

II. STATEMENT OF FACTS AND NATURE OF THE CASE ................................................. 2

   A. HERITAGE AUCTIONS BUSINESS AND COPYRIGHTED WORKS. ............................... 2

   B. DEFENDANTS' ACTIONS LEADING TO THE PRESENT DISPUTE. ............................... 6

   C. HERITAGE'S HARM AND ONGOING THREAT OF HARM. ....................................... 9

III. ARGUMENT .......................................................................................................... 11

   A. THERE IS A STRONG LIKELIHOOD THAT HERITAGE WILL SUCCEED ON THE MERITS OF ITS
      COPYRIGHT INFRINGEMENT CLAIMS. .............................................................. 11

      *a) Heritage owns valid copyrights in its auction listings. .............................. 11*

      *b) Heritage has established actionable copying by Defendant Collectrium. .... 12*

   B. THERE IS A STRONG LIKELIHOOD THAT HERITAGE WILL SUCCEED ON THE MERITS OF ITS
      CFAA AND TEXAS STATUTORY CLAIMS. .......................................................... 13

      *a) HA.com is a "protected computer" under the CFAA and "computer" under the Tex.
          Penal Code. ............................................................................................ 13*

      *b) Defendants intentionally exceeded authorized access of HA.com under the CFAA and
          intentionally accessed HA.com without the effective consent of the owner under the
          Texas Penal Code. ................................................................................ 14*

      *c) Defendants Obtained Information of Value by their unauthorized access. ... 15*

      *d) Heritage has suffered damage by Defendants' actions ............................. 16*

   C. HERITAGE WILL SUFFER IRREPARABLE HARM IF AN INJUNCTION IS NOT ENTERED. ........ 16

   D. THE BALANCE OF HARDSHIPS FAVORS HERITAGE. ............................................. 19

   E. THE PUBLIC INTEREST FAVORS ENTRY OF AN INJUNCTION. ................................. 20

   F. BOND AMOUNT. ........................................................................................... 20

IV. CONCLUSION. ....................................................................................................... 21

# TABLE OF AUTHORITIES

## CASES

*Acme Refrigeration Supplies, Inc. v. Acme Refrigeration of Baton Rouge, Inc.*, 961 F. Supp. 936 (E.D. La. 1996) ........................................................................................20

*Allied Mktg Group, Inc. v. CDL Mktg, Inc.*, 878 F.2d 806 (5th Cir. 1989) ...................17

*Am. Online, Inc. v. LCGM, Inc.*, 46 F.Supp.2d 444 (E.D. Va. 1998) ............................15

*American Airlines, Inc. v. Farechase, Inc.*, Case No. 067-194022-02 (67th Dist Court, Tarrant Cnty March 8, 2003) .............................................................................17

*Bridgmon v. Array Sys. Copr.*, 325 F.3d 572 (5th Cir. 2003).................................11, 12

*Creations Unlimited v. McCain*, 112 F.3d 814 (5th Cir. 1997) (per curiam) .................12

*EF Cultural Travel BV v. Zefer Corp*., 318 F.3d 58 (1st Cir. 2003).............................14

*Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335 (5th Cir. 1994) ........12

*MGE UPS Systs v. GE Indus*, 622 F.3d 361 (5th Cir. 2010) .........................................19

*Molex, Inc. v. Nolen*, 759 F.2d 474 (5th Cir. 1985) .......................................................16

*Parkem Indus. Servs., Inc. v. Garton*, 619 S.W.2d 428 (Tex. Civ. App. – Amarillo 1981, no writ) .........................................................................................................17

*Quantum Fitness Corp. v. Quantum Lifestyle Centers*, 83 F. Supp. 810 (S.D. Tex. 1999)...........20

*Register.com, Inc. v. Verio*, 356 F.3d 393 (2d Cir. 2004).............................................17

*Southwest Airlines Co. v. Boardfirst, L.L.C.*, 2007 U.S. WL4823761 (N.D. Tex, Sept. 12, 2007) ...........................................................................................14, 15, 17, 19

*United States v. Diapulse Corp. of Amer.*, 457 F.2d 25 (1972) ....................................19

*Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995 (Fed. Cir. 1986)............................19

## STATUTES

17 U.S.C. §410(c) ...........................................................................................................11

18 U.S.C. §1030...........................................................................................11, 13, 14, 16

Fed. R. Civ. P. 65(c) .......................................................................................................20

Tex. Civ. Prac. & Rem. Code §143.001(a) ...............................................................13, 16

Tex. Penal Code §33.01 .............................................................................................14, 15

Tex. Penal Code §33.02(a)...............................................................................................13

## I.      INTRODUCTION

Heritage is the leading auction house in multiple collectibles categories, including rare coins and currency, entertainment memorabilia, sports memorabilia, comic books and comic art, natural historical items, and many other traditional auction categories.  In the above categories, Heritage's sales are many times greater than those of Christie's or of any other auction house. Heritage owns and operates the website www.ha.com ("HA.com"), the leading site for the purchase, sale and auction of collectibles. Through HA.com, Heritage offers online-only auctions, displays catalogues for its many live auctions in dozens of categories of collectible items, and offers many client services and otherwise advertises its business. The centerpiece of HA.com is the original content offered by Heritage to customers and potential customers, comprising millions of individual, detailed, descriptions of collectible items offered for sale by Heritage over the past 23 years.

Defendant Collectrium, through the surreptitious and unlawful theft of a huge volume of this proprietary and copyrighted auction data, photographs and text from Heritage's servers, offers Heritage's content on its own site. Defendant Christie's is using Collectrium to sell Heritage's original, copyrighted material as Christie's own, and to divert customers from Heritage's companies, misleading collectors into thinking Christie's is knowledgeable and experienced in auction categories in which the Heritage Plaintiffs, in fact, are the clear marketplace leaders.

After Heritage believed it had ended Defendants' scraping of HA.com, Defendants continued to obtain and publish Heritage's copyrighted works up to the date of the filing of this lawsuit, obtaining the material in a manner which Heritage still has not been able to determine. Upon the filing of this lawsuit, Collectrium shut down the portions of its website containing

some of the Heritage content. However, Collectrium is representing to its customers that this is for "scheduled maintenance" and not for the pendency of this litigation, and Defendants continue to have possession of approximately 5 million of Heritage's copyrighted collectible item listings. While Defendants have taken some of Heritage's copyrighted works off of the Collectrium website, Defendants' continued possession of the works leaves them able to use the works in other surreptitious ways, such as sending some or all of the works to potential Collectrium customers or Christie's consignors as evidence of their expertise which is, in fact, Heritage's.

Further, despite Defendants stated interest in a "private standstill agreement", Defendants have refused an agreed injunction and have now moved this Court to dismiss this case and compel Plaintiffs' claims to arbitration, which would leave Plaintiffs without an adequate remedy were such an agreement to be breached. For these reasons, Plaintiffs seek a preliminary injunction enjoining Defendants from their continued, unauthorized possession and use of Heritage materials, and an order that Defendants cease scraping, copying, distributing any materials concerning Heritage auctions, whatever the source of such information.

## II.    STATEMENT OF FACTS AND NATURE OF THE CASE

### A.    Heritage Auctions Business and Copyrighted Works.

Heritage is the leading auction house in the world in multiple collectibles categories, including rare coins and currency, entertainment memorabilia, sports memorabilia, comic books and comic art, historical items, and many other traditional auction categories. Affidavit of Steve Ivy, attached herein as Exhibit A, ¶2. In the above categories, Heritage's sales are many times greater than those of Christie's or of any other auction house. Exh. A, ¶2.

Heritage owns and operates the website www.ha.com ("HA.com"), the leading site for the purchase, sale and auction of collectibles. Exh. A, ¶3. Heritage owns and maintains all servers from which HA.com is operated. Affidavit of Brian Shipman, attached herein as Exhibit

B, ¶2. When a user accesses HA.com, they are accessing the Heritage servers. Exh. B, ¶2. Through HA.com, Heritage offers online-only auctions in which customers from all over the world participate, displays catalogues for its many live auctions in dozens of categories of collectible items, and offers many client services and otherwise advertises its business. Exh. A, ¶3. Heritage accepts consignments on a weekly basis, an indeterminate number of which are the result of HA.com's content and advertising. Exh. A, ¶8. Heritage has invested substantial time and more than $20 million over many years in developing its proprietary computer system and website, in addition to the vast sums it has expended to generate the original content contained therein. Exh. A, ¶3.

Heritage has developed a substantial amount of goodwill and its success and valuable reputation is in no small part due to its original innovations and position at the forefront of using the internet and technology in the auction and collectibles industries. Exh. A, ¶4.

The centerpiece of HA.com is the original content offered by Heritage to customers and potential customers. Exh. A, ¶5. Heritage offers images, taken by Heritage employees and independent contractors engaged by Heritage, of every item offered for sale, or sold previously, at a Heritage auction since 1993, comprising over 8 million original images. Exh. A, ¶5. HA.com typically also offers detailed descriptions, written by Heritage employees and independent contractors engaged by Heritage, of such items. Exh. A, ¶5. These descriptions encompass not only the physical characteristics of the items, but also their history and provenance, and Heritage's opinions regarding the quality of particular items vis à vis other specimens of the same item, or items' significance within the category in which they are being sold. Exh. A, ¶5. This compilation of visual and textual content for millions of individual items provides HA.com users with a unique experience and is central to Heritage's business. Exh. A, ¶5. No other auction

house or other participant in the collectibles marketplace offers even a fraction of the images or written content provided by Heritage on HA.com. Exh. A, ¶6. Users can see photographs and scholarly text about a particular item offered for sale, review past sales of that item or items similar to it, and compare the current item with the past items to assist them in assessing value and historical market trends, as well as to see where an item they might own fits within the marketplace in that collectibles category. Exh. A, ¶6.

These millions of individual compilations of content generated by Heritage for each present and archived past Heritage auctioned item, are copyrighted works, and are each identified as such on each and every page of the HA.com website through display of an appropriate copyright notice. Exh. A, ¶7. In addition, Plaintiff HCC registered its copyright in the website and individual archived listings in Reg. TX 7-451-606 (2009) and HCC's copyrights in descriptions, photographs from catalogs that were eventually incorporated into the HA.com website in Reg. TX 7-622-294 (2012), TX 7-609-889 (2012), TX 7-612-006 (2012), and TX 7-611-965 (2012). Exh. A, ¶7. Plaintiff HAI registered its copyright in the website and archived listings in Reg. VA 1-695-279 (1995), and TX 7-015-793 (2008). Exh. A, ¶7. Plaintiff HNAI registered its copyright in additions to the archives and individual listings in Reg. TX 6-443-330 (1995), TX 6-521-427 (2003), TX 6-521-423 (2003), TX 6-521-424 (2004), TX 6-443-325 (2004), TX 6-443-328 (2004) TX 6-443-329 (2004), TX 6-521-428 (2005), TX 6-443-326 (2005), TX 6-443-327 (2005), TX 6-443-328 (2005), TX 6-521-426 (2005), TX 7-744-937 (2012), TX 7-653-598 (2012), TX 7-877-435 (2012), TX 7-692-230 (2012).  Plaintiff HAGI registered its copyright in additions to the archives in Reg. TX-7-738-112 (2012) and TX 8-223-043 (2016). Exh. A, ¶7.

Heritage also conducts online auctions through the HA.com website, on a weekly basis.

Heritage's online weekly auctions, live auctions (of which Heritage conducts dozens every year), and solicitations for consignments are all advertised on the HA.com pages containing archived sold item listings. Affidavit of Brian Shipman, attached herein as Exhibit B, ¶5. HA.com also contains the images and descriptions of items listed in upcoming auctions. Exh. B, ¶5. Heritage restricts some of its online content, including sales prices and the ability to place a bid on online auctions, to HA.com registered users. Exh. B, ¶6.

All registered users of HA.com must agree to the terms of a Website Use Agreement in order to register, which include the following:

**Statement of Ownership**

The Website is solely and exclusively owned and maintained by Heritage, including but not limited to rights, title, interests, trademarks (registered or not), copyrights (registered or not), database rights, rights of authorship, trade secrets, sui generis, and all intellectual property and proprietary rights. Heritage is the exclusive owner of all Website content, appearance, organization, and underlying software, code, and stored data, including but not limited to images, descriptions, text, prices realized lists, articles, logos, audio and video. Your visitation to the Website, or usage of any features therein, does not grant You ownership of any feature or content contained therein.

…

**Prohibited Website Uses**

You may not republish, commercially distribute, duplicate, or exploit any aspect of the Website, either code or content. Other than the Fair Usage specified in the License for Limited Uses, You may not download, reproduce, modify, distribute, transfer, sell, or create derivative works of any code, contents, data, whether specifically copyrighted or not. Any unauthorized usage of the Website may subject You to civil or criminal prosecution. By accessing the Website, You agree not to:

   …

   b.  engage in any collection of data, through such practices as "screen scraping," "database scraping," "robot," "spider" or other automatic means;

   …

   d.  use the Website or its contents or code in violation of our intellectual property or proprietary rights;

…

**Revocation**

If You violate any part of this Agreement, We immediately revoke permission for You to use the Website, and you must hereby agree to immediately destroy any copies You have made of any and all content.

Exh. B, ¶6.

**B.     Defendants' Actions Leading to the Present Dispute.**

Heritage uses various technological means to protect its HA.com site from intrusions. Exh. B, ¶7. Among other things, Heritage instructs its system to send alerts to Heritage's IT personnel whenever there is unusually high traffic on HA.com originating from a single IP address or customer account because this might indicate robotic crawling/scraping of the HA.com website through that account. Exh. B, ¶7. Such activity is in violation of Heritage's terms of use. Exh. B, ¶7. Heritage personnel can then investigate the situation to determine whether the specific activity has been authorized by Heritage, and if not block the IP address and/or suspend the customer's account. Exh. B, ¶7. Spiders, and other crawling/scraping software are damaging to a website in several ways: 1) they can overwhelm a website by appearing to be a great number of users accessing many pages at once, limiting the websites' performance for legitimate users; 2) they allow third parties to steal large amounts of information and content before steps can be taken to shut down the spiders' access. Exh. B, ¶7. The possibility of overburdening and shutting down the website is an especially high risk for HA.com because it might effect the online auctions in process on HA.com. Exh. B, ¶7.

In July 2016 Heritage was first notified through Heritage's software that a robotic spider was operating on HA.com. Exh. B, ¶8. A "spider" is a type of crawling, or scraping, software utilized by a third party which permeates a website and copies information off of all the pages of the website. Exh. B, ¶8. "Spidering" and other website crawling/scraping software allows a third party to obtain copies of all of the content off of the website at a superhuman speed, without actually viewing the web pages. Exh. B, ¶8. (Spiders are named such because they branch out in

multiple directions, or legs, scraping from a number of pages after entering the website through one page.) Exh. B, ¶8.

The computer used to register an account may be verified using the Guaranteed Unique Identifier ("GUID"), which is an identification number unique to every computer when it first makes contact with HA.com. Exh. B, ¶9. Heritage traced the spider to an HA.com account under the name of Leanne Wise of Boiling Springs, SC ("the Wise Account"). Exh. B, ¶9. When the Wise Account was created, it already had a GUID, indicating that the Wise Account was created using a computer that had previously created an account with Heritage. Exh. B, ¶9. Heritage determined that the computer with this same GUID had been used to create an HA.com account in the name of David La Cross ("the La Cross Account").  David LaCross is the Director of Product Development at Defendant Collectrium. Exh. B, ¶9. The La Cross account had accessed HA.com using an IP address associated with Christie's. Exh. B, ¶9.

Over the course of nine days, the Wise account accessed the HA.com website over 186,000 times. Exh. B, ¶10. Based on the speed and length of time spent on each page, and the fact that the account's IP address was periodically randomized to different locations around the world to circumvent Heritage's protective systems (a tactic known as IP address randomization), Heritage had difficulty identifying the source of the activity, but eventually identified this behavior as that of a spider and that it originated in the Wise account. Exh. B, ¶10.

Once Heritage identified that the Defendants' spider was accessing HA.com through the Wise account, Heritage closed that account, thereby cutting off access to some parts of HA.com. Exh. B, ¶11. Closing the account, however, did not block Defendants' spider from continuing to use the copyrighted descriptions and images of items sold in past auctions from areas of HA.com that Defendants had already accessed and copied. Exh. B, ¶11.

After the Wise Account was closed, another account, in the obviously false name "Jason Bourne of Kathmandu" ("the Bourne Account"), was opened and began operating Defendants' spider. Exh. B, ¶12. Heritage could determine that the Bourne Account was operating Defendants' spider because the spider operated in the same manner (IP randomization, etc.) and was uploading the scraped pages into files with similar URLs. The Bourne Account accessed the HA.com account over 131,000 times within 18 hours. Exh. B, ¶12. Heritage then reviewed other accounts operating in the same unique manner as the Wise and Bourne Accounts, and identified a total 31 accounts operating Defendants' spider on the HA.com site, many of which can be identified on their face as using false identification, similar to the Bourne account. Exh. B, ¶12. Heritage has now determined that Defendant's spider has been operating on HA.com since as early as March 2016. Exh. B, ¶12. Heritage has suspended all of these accounts that it has been able to identify. Exh. B, ¶12.

Defendants' Spider spidered the HA.com website without logging into an HA.com account first, to identify the pages containing archived auction sales information, including spidering search pages which contained links to the auction sales item pages. Exh. B, ¶13. Defendants' Spider then logged into Defendants' HA.com accounts to scrape the auction sales information previously identified. Exh. B, ¶13. Heritage determined that approximately 5 million pages within HA.com have been spidered by Defendants, which is the same approximate amount of individual auction item listings that appear on HA.com. Exh. B, ¶13. Defendants' spider made copies of these pages that it saved in online folders with titles containing "project" and a series of numbers. Exh. B, ¶13. There was no way for Heritage to retrieve the copies of 5 million pages-worth of HA.com content that Defendants had taken. Exh. B, ¶13.

Heritage later determined that the Collectrium site was displaying Heritage content, and also modifying that content using a combination of hand-editing and machine-learning. Exh. B, ¶14. The hand editing is apparent where certain paragraphs within a longer description were removed. Exh. B, ¶14. In some descriptions, references to Heritage were removed. Affidavit of Laura Tiemstra, attached herein as Exhibit C, ¶3. The machine-learning edits are apparent where descriptions cut off after a certain number of lines, and metadata is created when certain words appear in the description, such as "inscription" for an item that was inscribed. Exh. B, ¶14. In many of the Heritage sale items listings that appear on the Collectrium site, the exact description from Heritage's site appeared, along with images and prices scraped from HA.com. Exh. B, ¶14. See also Exhibits 1-4 of Exh. C. Approximately 89% of all coins and currency listings on Collectrium's site were Heritage copyrighted auction listings, while Heritage content comprised approximately 97% of the comic books and trading cards listings. Exh. C, ¶3.

By the start of October, Defendants' spider was no longer detectable by Heritage's software. Exh. B, ¶15. However, the Collectrium website was continuing to display new Heritage auction listings. Exh. B, ¶15. Heritage has been unable to identify how Defendants obtained this additional content. Exh. B, ¶15.

The time and efforts incurred by Heritage's executives and legal and IT departments, to identify the source of the scraping, stop the scraping, and ongoing efforts to stop Defendants' use of the valuable information stolen has caused a loss to Heritage in excess of $5,000. Exh. A, ¶13.

**C.**    **Heritage's Harm and Ongoing Threat of Harm.**

Defendants scraped, and therefore have possession of, approximately 5 million of Heritage's copyrighted auction listings. Defendants have been and are believed to be continuing to obtain Heritage's copyrighted works in a manner as yet unidentifiable by Heritage. Exh. B, ¶15. That Heritage's content is on the website of a Christie's-owned entity, in direct competition

with Heritage is damaging because all advertising and potential business from the customers viewing the content will be to the benefit of Christie's rather than Heritage. Exh. A, ¶9.

Heritage's auctions benefit from the participation of persons who see advertisements for items listed for upcoming sale when the person is visiting HA.com to view past auction listings. Exh. A, ¶10. Even if such a person does not ultimately purchase the item, that person's bid drives up the ultimate sales price of the item. Exh. A, ¶10. It is impossible to know how many customers would have seen an advertisement for an item they would ultimately enter a bid for in a Heritage auction if they had visited the HA.com website to view past auction sales rather than be able to view those same sales on Collectrium's website. Exh. A, ¶11.

It is further impossible to know how many potential consignments Heritage will lose because a collector looking at Heritage's listings of past sales on Collectrium, and wanting to know how a piece in their collection might compare, would request a valuation from Collectrium who will send that consignment to Christie's rather than to Heritage itself. Exh. A, ¶12.

After the Complaint in this action was filed, Collectrium removed its entire database. Exh. C, ¶6. Although Defendants' represented to Heritage that it had removed all of the Heritage content from its website, that was not true, and only after Heritage told Defendants' counsel of additional Heritage content still on Collectrium's site was the remaining Heritage content removed. Exh. C, ¶7. However, Collectrium has also made the following announcement to its members: "We'll be back soon. Please bear with us while the Collectrium Market Data[BETA] service is undergoing scheduled maintenance. Happy Holidays!" Exh. C, ¶6. As of January 25, 2017, the notice was still in place. Exh. C, ¶6.

Upon learning of Plaintiffs' intention to move for preliminary injunctive relief, Defendants suggested the parties enter into a "standstill agreement" for the pendency of this

action. Exh. C, ¶7. After significant negotiation over the terms of such an agreement, Defendants filed the currently-pending motion to compel arbitration and dismiss this action. Exh. C, ¶7. Defendants insist that any standstill agreement be "private" and refused to enter the agreement as a joint stipulation on the record. Exh. C, ¶7.

### III.   ARGUMENT

A preliminary injunction may be granted when an applicant has demonstrated (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury to the movant outweighs whatever damages the proposed injunction may cause the opposing party; and (4) that granting the injunction is not adverse to the public interest. *See Paulson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008); *Quantum Fitness Corp. v. Quantum Lifestyle Centers, LLC*, 83 F. Supp. 2d 810, 816 (S.D. Tex. 1999).   As set forth below, the evidence presented by Heritage in support of this Motion supports a granting of the preliminary injunctive relief sought. Preliminary injunctive relief is a remedy provided for both infringement of copyrights (17 U.S.C. §502(a)) and violations of the Computer Fraud and Abuse Act (18 U.S.C. §1030(g)).

### A.   There Is a Strong Likelihood That Heritage Will Succeed on the Merits of Its Copyright Infringement Claims.

"A copyright infringement claim requires proof of (1) ownership of a valid copyright and (2) actionable copying, which is the copying of constituent elements of the work that are copyrightable." *Bridgmon v. Array Sys. Copr.*, 325 F.3d 572, 576 (5th Cir. 2003).

### a)   Heritage owns valid copyrights in its auction listings.

Heritage's registrations of these works with U.S. Copyright Office creates a presumption of ownership and validity. 17 U.S.C. §410(c).   Heritage has presented proof that it owns the

following copyright registrations in the HA.com website and catalogs where some of the auction listings first appeared.[1]

These auction listings consist of images of the item, descriptions of the item, and other proprietary data. . The images were taken by Heritage employees and independent contractors engaged by Heritage. The descriptions, written by Heritage employees and independent contractors engaged by Heritage, encompass not only the physical characteristics of the item but also its history and provenance, Heritage's opinions regarding the quality of the item, including vis a vis other specimens of the same or similar items, and the item's historical significance and significance within the category in which it is sold.

      **b)**     **Heritage has established actionable copying by Defendant Collectrium.**

Actionable copying requires two determinations: whether (1) the alleged infringer copied the copyrighted material in his own work; and (2) whether there is substantial similarity between the original and the copy. *Bridgmon v. Array Sys. Copr.*, 325 F.3d 572, 576 (5th Cir. 2003). "Circumstantial evidence may support an inference of copying if the defendant had access to the copyrighted work and there is 'probative similarity' between the copyrighted work and the allegedly infringing work." *Id.* citing *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994). As to substantial similarity, "a side-by-side comparison must be made" to "determine whether a layman would view the two works as 'substantially similar.'" *Id.* citing *Creations Unlimited v. McCain*, 112 F.3d 814, 816 (5th Cir. 1997) (per curiam).

---

[1] Reg. TX 7-451-606 (2009), TX 7-622-294 (2012), TX 7-609-889 (2012), TX 7-612-006 (2012), TX 7-611-965 (2012), VA 1-695-279 (1995), TX 7-015-793 (2008), TX 6-443-330 (1995), TX 6-521-427 (2003), TX 6-521-423 (2003), TX 6-521-424 (2004), TX 6-443-325 (2004), TX 6-443-328 (2004) TX 6-443-329 (2004), TX 6-521-428 (2005), TX 6-443-326 (2005), TX 6-443-327 (2005), TX 6-443-328 (2005), TX 6-521-426 (2005), TX 7-744-937 (2012), TX 7-653-598 (2012), TX 7-877-435 (2012), TX 7-692-230 (2012), TX-7-738-112 (2012) and TX 8-223-043 (2016).

Heritage has presented evidence that a robotic spider scraping approximately 5 million pages from HA.com initially entered HA.com through the same computer that also created an account in the name of the Director of Product Development at Collectrium, using an IP address associated with Christie's. That these auction listings then appeared on Collectrium's database is sufficient evidence that Defendants copied Heritage's works.

That the works are substantially similar is also well-established. Heritage has presented several examples of the copyrighted works as they appear on Collectrium's database and on HA.com so the Court may make a side-by-side comparison and see that the only difference is in formatting as Collectrium's copying removed spaces between paragraphs. Many of the millions of copied works appear on Collectrium's website verbatim, and most are substantially identical.

**B.      There Is a Strong Likelihood That Heritage Will Succeed on the Merits of Its CFAA and Texas Statutory Claims.**

To succeed on its claims under the Federal Computer Fraud and Abuse Act, Plaintiffs must show that Defendants "intentionally accesse[d] a computer without authorization or exceed[ed] authorized access, and thereby obtain[ed] … information from any protected computer", or that Defendants "knowingly and with intent to defraud, accesse[d] a protected computer without authorization, or exceed[ed] authorized access, and by means of such conduct further[ed] the intended fraud and obtain[ed] anything of value". 18 U.S.C. §§1030(a)(2)(C), 1030(a)(4).

To succeed on its claims under the Texas Harmful Access by Computer statute, Plaintiffs must show that Defendants "knowingly accesse[d] a computer, computer network, or computer system without the effective consent of the owner", and that Plaintiffs or their property "has been injured as a result". Tex. Penal Code §33.02(a), Tex. Civ. Prac. & Rem. Code §143.001(a).

  a)      *HA.com is a "protected computer" under the CFAA and "computer" under the Tex. Penal Code.*

13

Under the CFAA, a "computer" is "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" 18 U.S.C. §1030(e)(1). Under the Tex. Penal Code, a "computer" is "an electronic, magnetic, optical, electrochemical, or other high-speed data processing device that performs logical, arithmetic, or memory functions by the manipulations of electronic or magnetic impulses and includes all input, output, processing, storage, or communication facilities that are connected or related to the device." Tex. Penal Code §33.01(4). A "protected computer" under the CFAA is "a computer which is used in or affecting interstate or foreign commerce or communication". 18 U.S.C. §1030(e)(2)(B).

Logging into the website HA.com constitutes accessing Heritage's computer. *Southwest Airlines Co. v. Boardfirst, L.L.C.*, 2007 U.S. WL4823761, *12-13 (N.D. Tex, Sept. 12, 2007). Heritage has also submitted evidence that it conducts online auctions through HA.com, in which customers from all over the world participate.

> **b)** ***Defendants intentionally exceeded authorized access of HA.com under the CFAA and intentionally accessed HA.com without the effective consent of the owner under the Texas Penal Code.***

Under the CFAA, "exceeds authorized access" means "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter". 18 U.S.C. §1030(e)(6). "A number of courts in other jurisdictions have indicated … a computer use which violates the terms of a contract made between a user and the computer owner is unauthorized" *Southwest Airlines Co. v. Boardfirst, L.L.C.*, 2007 U.S. WL4823761, *13 (N.D. Tex, Sept. 12, 2007), *citing, EF Cultural Travel BV v. Zefer Corp.*, 318 F.3d 58, 62 (1st Cir. 2003) (noting that "[a] lack of authorization could be established by an explicit statement on the website restricting access," giving rise to a CFAA

violation if a website user thereafter violated the terms of use); *Am. Online, Inc. v. LCGM, Inc*., 46 F.Supp.2d 444, 450 (E.D. Va. 1998) (concluding that defendants' use of AOL membership to harvest e-mail addresses of AOL users was unauthorized because such actions violated AOL's terms of service).

Under the Texas Penal Code, "consent is not effective if … used for a purpose other than that for which the consent was given." *Southwest Airlines Co. v. Boardfirst, L.L.C.*, 2007 U.S. WL4823761, *16 (N.D. Tex, Sept. 12, 2007), *citing* Tex. Penal Code §33.01(12)(E). While websites may give consent to virtually anyone, such consent may be conditioned on compliance with terms of use. *Id*.

Heritage has presented proof that Defendants consented to terms of use of the HA.com website, which included a prohibition of robotic scraping activity including spidering, as well as using any material copied from HA.com for commercial benefit. The website terms of use also provided that any consent from Heritage to use its site was revoked automatically if a user engaged in such activities.  Defendants knew from the start their spidering activity was prohibited as is further evidenced by the IP randomization employed to hide the source of the spidering and delay Heritage's ability to stop it. After Defendants' initial HA.com accounts were suspended, Defendants then created new accounts using obviously false names and information to reenter HA.com. Defendants' actions were without effective consent and exceeding authorization, and all of Defendants' actions were clearly intentional.

<strong>c)</strong>      ***Defendants Obtained Information of Value by their unauthorized access.***

Under the CFAA, Defendants must have obtained something of value by way of their unauthorized access. Heritage has presented proof that Defendants scraped approximately 5 million pages from the HA.com website, and that Defendants' website contained information

15

identical to the auction listings on HA.com. Further, Heritage has presented proof that the presence of the copyrighted auction listings draws customers and potential customers to the HA.com website, which adds significant value to the advertising potential on HA.com and bringing in new customers from around the world.

**d)** *Heritage has suffered damage by Defendants' actions*

The CFAA requires Heritage to have suffered losses of at least $5,000, defining "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service". 18 U.S.C. §1030(e)(33). Under Texas law, a civil cause of action is granted to any "person who is injured or whose property has been injured as a result of a violation under Chapter 33, Penal Code". Tex. Civ. Prac. & Rem. Code §143.001(a).

Heritage has submitted evidence that Defendants' scraping activities has caused a loss in excess of the $5,000 threshold under the CFAA, in part due to Defendants' specific efforts to thwart Heritage's ability to identify the source of the unauthorized scraping and shut it down. Heritage has further submitted evidence that it has suffered additional losses of potential customers' activity, impossible to calculate. Further the threat is ongoing as, at the time of filing the Complaint, Defendants' website contained auction listings from contemporary sales. Heritage has been unable to identify how Defendants continue to acquire its copyrighted works, but one possibility is that Defendants have continued to scrape in a manner undetectable by Heritage.

**C.**   **Heritage Will Suffer Irreparable Harm If an Injunction Is Not Entered.**

In this Circuit, this element of injunctive relief is satisfied for "'an injury which cannot be compensated or for which compensation cannot be measured by any certain pecuniary standard.'" *Molex, Inc. v. Nolen*, 759 F.2d 474, 477 (5th Cir. 1985), quoting *Parkem Indus.*

*Servs., Inc. v. Garton*, 619 S.W.2d 428, 430 (Tex. Civ. App. – Amarillo 1981, no writ).   In scraping cases, this Court has held that irreparable harm exists where the defendants' abuse of plaintiff's website data might cause diversion of customer business and thereby "would cause [plaintiff] irreparable harm through loss of reputation, good will, and business opportunities." *Southwest Airlines Co. v. Boardfirst, L.L.C.*, 2007 U.S. WL4823761, *18 (N.D. Tex. Sept. 12, 2007), quoting *Register.com, Inc. v. Verio*, 356 F.3d 393, 404 (2d Cir. 2004).   In the *Southwest Airlines* case, this Court noted that defendant's attempt to hijack Southwest's website data for purposes of diverting customers to book flights through defendant's own site caused "economic harm …inherently difficult if not impossible to quantify," Id. at *18, and that "Because Southwest is not able to calculate the amount of economic harm it has suffered by reason of BoardFirst's activities with any fair degree of precision, the Court finds that Southwest would be irreparably harmed absent entry of a permanent injunction". Id. See also *Allied Mktg Group, Inc. v. CDL Mktg, Inc.*, 878 F.2d 806, 810 (5th Cir. 1989)("Irreparable harm exists 'even where economic rights are involved, when the nature of those rights makes establishment of the dollar value of the loss – especially difficult or speculative"); *American Airlines, Inc. v. Farechase, Inc.*, Case No. 067-194022-02, slip op. at 3-4 (67th Dist Court, Tarrant Cnty March 8, 2003)(scraping software allowing access to American Airlines' website for flight schedules, fares and seat availability in violation of website terms and conditions caused irreparable harm because, inter alia, it was impossible or extremely difficult to determine how many potential users of American's site were diverted, loss of goodwill and customer business, and loss of exclusive marketing opportunities offered on American's website).

Heritage's auction listings provide collectors with a method for viewing how items similar to pieces in their own collection have sold in the past, as well as displaying the

experience and expertise with which Heritage handles the items it sells. Collectrium offers collectors the option of submitting pieces in their collection for appraisal by experts (who are all experts employed by Christie's looking for consignments). If a collector views a Heritage auction listing on Collectrium's site and believes the description to have been generated by Collectrium/Christie's, the collector is more likely to submit pieces of their own collection to Collectrium/Christie's for appraisal. Even if the collector believes the description was generated by Heritage, if they are able to view the Heritage archived item listings on Collectrium's site (in certain categories, Heritage's listings constitute over 80% of all the listings) they may still be more likely to submit their piece to Collectrium/Christie's for appraisal out of convenience.

HA.com also contains advertisements for upcoming auctions on the pages containing collectible item listings. Collectors who view these listings on HA.com may see ads for pieces of interest to them in current and upcoming sales. If the collector is able to view the Heritage listings on Collectrium, they may never learn of items listed in upcoming Heritage sales which they would have placed a bid on, driving up the ultimate sales price of an item even if not ultimately buying the item themselves.

It would be impossible to measure and assign a monetary compensation for such lost business. Defendants still have copies of millions of Heritage copyrighted works, comprising pictures of items, text descriptions, provenance information and Heritage's opinions regarding the works.  Heritage has no idea where Defendants are storing these files, with whom they might already have been shared, and whether or not Defendants will restore them to the Collectrium website or some other location.  Defendants have already once falsely assured Heritage that the items were no longer visible on Collectrium.  As Heritage is accepting consignments and conducting online auctions on a weekly basis on HA.com, to allow Defendants continued access

to and use of Heritage's copyrighted works in their possession will only compound the immeasurable damages already suffered.  *See, e.g., MGE UPS Systs v. GE Indus*, 622 F.3d 361, 371 (5th Cir. 2010).

### D.   The Balance of Hardships Favors Heritage.

Consideration of this element starts with the settled proposition that even were an injunction to put Defendant Collectrium out of business, "that eventuality …is entirely a function of the fact that [Collectrium's] niche business is completely dependent on an impermissible use of the [Heritage] website."  *Southwest Airlines*, supra, at *18.  See also *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n. 12 (Fed. Cir. 1986)("One who elects to build a business on a product found to infringe cannot be heard to complaint if an injunction against continuing infringement destroys the business so elected"); *United States v. Diapulse Corp. of Amer.*, 457 F.2d 25, 29 (1972)("no vested interest in a business activity found to be illegal").

Defendant Collectrium's project of populating its market data site with stolen Heritage images, text and data has increased exponentially in the past six months.  At some point after commencement of this action Collectrium took down the site for "scheduled maintenance", and Defendants are now offering Plaintiffs the possibility of a "private standstill agreement" whereby Defendants would keep this Heritage content off the Collectrium site.  Defendants are thereby demonstrating that taking down the Heritage content would not be overly burdensome.  This, however, is not the equivalent of a preliminary injunction ordered by the court instead. First, Defendants are representing to the public that the relevant portions of their website are only down for scheduled maintenance over the holidays (which are now past). Were the Defendants to breach such a "standstill agreement", Heritage's first step would be to seek an order such as this, enjoining Defendants from further infringing activity. Further, Defendants have now filed a motion for the Court to compel arbitration and dismiss this litigation. Were Defendants' motion

granted and this action dismissed, an arbitrator would be unable to issue an injunction if the Defendants' breached a standstill agreement and Heritage would be forced to initiate a new lawsuit, imposing an unfair delay on Heritage's receipt of a remedy.

Defendants, on the other hand, claim to have ceased all activity identified in Plaintiffs' Complaint. A preliminary injunction requiring they comply with the terms to which they have already agreed to is no hardship to them.

### E.     The Public Interest Favors Entry of an Injunction.

The public interest is served whenever federal and state laws are enforced. *Quantum Fitness Corp. v. Quantum Lifestyle Centers*, 83 F. Supp. 810, 832 (S.D. Tex. 1999), citing *Acme Refrigeration Supplies, Inc. v. Acme Refrigeration of Baton Rouge, Inc.*, 961 F. Supp. 936, 941 (E.D. La. 1996). Defendants have and may continue to publish Heritage's copyrighted works without the Heritage copyright notice and in a manner that obscures the creator of the works. Any time during which the Heritage copyrighted works are available on the Defendants' website, or otherwise published by Defendants, the public are deceived as to the origin of the work.

Preliminary relief will help prevent collectors from entrusting their valuable collectibles to a company that they believe to have greater knowledge of certain types of collectibles than that company does because the descriptions displaying such knowledge were actually written by Heritage. Granting a preliminary injunction in this case will not disserve the public interest.

### F.     Bond Amount.

Rule 65(c) of the Federal Rules of Civil Procedure provides that "no restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."  In light of the strong nature of Heritage's evidence, Heritage requests that this Court set a bond amount

of no more than five thousand dollars ($5,000.00) in connection with the issuance of the injunctive relief requested.  Defendants are using the Plaintiffs' copyrighted works in the same industry for the same purposes and benefits as Plaintiffs.  The evidence establishes that this infringement has been purposeful and threatens to continue during the pendency of this action. For this reason, a bond of no more than five thousand dollars ($5,000.00) should be more than adequate to protect Defendants' interests.

## IV.    CONCLUSION

For the foregoing reasons, the Court should order and enjoin Defendants and all those in active concert or participation with them, including any counsel, from:

(a)    Accessing any HA.com account website using false information or robotic scraping software, including but not limited to, spiders;

(b)    Continuing to infringe Plaintiffs' copyright in the Infringed Works, including but not limited to auction item descriptions, auction item sales prices, images, information, and data;

(c)    Selling, distributing, publishing, or using any property obtained from the HA.com website, including but not limited to Plaintiffs' copyrighted works, auction item descriptions, auction item sales prices, images, information, and data;

(d)    Removing, downloading, or copying property from the HA.com website without Plaintiffs' authorization, including but not limited to Plaintiffs' copyrighted works, auction item descriptions, auction item sales prices, images, information, and data;

(e)    Removing, downloading, or copying from any third-party website Plaintiffs' copyrighted works, including but not limited to Plaintiffs' copyrighted works,

auction item descriptions, auction item sales prices, images, information, and

data; and

(f)　　Otherwise engaging in acts of unfair competition and interference with Plaintiff,

Plaintiffs' customer relationships, the HA.com website, and Plaintiffs'

relationships with any account holder of an HA.com account.

Dated:  January 25, 2017　　　　　　　By: */s/Mark W. Bayer*　　　　　　　　　
　　　　　　　　　　　　　　　　　　　　Mark W. Bayer
　　　　　　　　　　　　　　　　　　　　BARNES & THORNBURG LLP
　　　　　　　　　　　　　　　　　　　　2100 McKinney Avenue, Suite 1250
　　　　　　　　　　　　　　　　　　　　Dallas, TX 75201
　　　　　　　　　　　　　　　　　　　　Telephone: (214) 258-4101
　　　　　　　　　　　　　　　　　　　　E-mail: Mark.Bayer@btlaw.com

　　　　　　　　　　　　　　　　　　　　Armen R. Vartian (*admitted pro hac vice*)
　　　　　　　　　　　　　　　　　　　　Laura C. Tiemstra (*admitted pro hac vice*)
　　　　　　　　　　　　　　　　　　　　LAW OFFICES OF ARMEN R. VARTIAN
　　　　　　　　　　　　　　　　　　　　1601 N. Sepulveda Blvd., #581
　　　　　　　　　　　　　　　　　　　　Manhattan Beach, CA 90266
　　　　　　　　　　　　　　　　　　　　Telephone: (310) 372-1355
　　　　　　　　　　　　　　　　　　　　E-mail: armen@vartianlaw.com
　　　　　　　　　　　　　　　　　　　　E-mail: laura@vartianlaw.com

　　　　　　　　　　　　　　　　　　　　**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF CONFERENCE

Since January 5, 2017, I have corresponded with opposing counsel to determine if Defendants would accept an agreed injunction. They have repeatedly rejected that suggestion. We have also negotiated for more than two weeks over the terms of a potential "standstill agreement." Despite numerous written communications and a telephone conference on January 20, 2017, the parties have been unable to reach agreement. Therefore, this matter is presented to the court for resolution.

By: */s/Mark W. Bayer*
Mark W. Bayer

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document has been electronically filed and served on counsel for all parties of record through the CM/ECF system in accordance with the Federal Rules of Civil Procedure on January 25, 2017.

By: */s/Mark W. Bayer*
Mark W. Bayer

DMS 4629109v1