**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| HERITAGE CAPITAL CORPORATION, HERITAGE AUCTIONEERS & GALLERIES, INC., HERITAGE NUMISMATIC AUCTIONS, INC., HERITAGE AUCTIONS, INC., HERITAGE VINTAGE SPORTS AUCTIONS, INC., CURRENCY AUCTIONS OF AMERICA, INC., and HERITAGE COLLECTIBLES, INC., | § § § § § § § § § | |
| Plaintiffs, | § § | |
| vs. | § § | **No. 3:16-cv-03404-D** |
| CHRISTIE'S, INC. and COLLECTRIUM, INC., | § § § | |
| Defendants. | § § | |

**DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page(s)**

I.   PLAINTIFFS' MOTION SHOULD BE DEFERRED TO ARBITRATION ...............................7

II.  PLAINTIFFS CANNOT ESTABLISH IRREPARABLE HARM ...............................7

III. THERE IS NO LIKELIHOOD OF SUCCESS ON THE MERITS.............................11

    A. Plaintiffs Present No Factual Allegations Regarding Defendant Christie's............................11
    B. Plaintiffs Cannot Prevail on Their Copyright Claim...............................11
        1. Plaintiffs Have Not Established What Their Registrations Cover ...................................11
        2. Plaintiffs Have Impliedly Licensed Their Website Content ............................15
        3. Collectrium's Use of Plaintiffs' Information Is Fair Use................................16
    C. Plaintiffs Are Unlikely to Succeed on Their Computer Fraud Claims ..................................18
        1. Plaintiffs Fail to Establish Requisite Injury .....................................19
        2. Plaintiffs Cannot Establish That Defendants Accessed Their Website Without Authorization or Exceeded Authorized Access ..............................................20

IV. THE BALANCE OF EQUITIES WEIGHS IN DEFENDANTS' FAVOR ...............................21

V.  THE PUBLIC INTEREST WILL NOT BE SERVED THROUGH ISSUANCE OF A PRELIMINARY INUNCTION ..................................................23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alliantgroup, L.P. v. Feingold,*
    803 F. Supp. 2d 610 (S.D. Tex. 2011) .................................................................................18

*Am. Inst. of Physics v. Winstead PC,*
    2013 WL 6242843 (N.D. Tex. Dec. 3, 2013).................................................................16, 17

*Authors Guild, Inc. v. Google Inc.,*
    954 F. Supp. 2d 282 (S.D.N.Y. 2013) ...............................................................................16

*Axxiom Mfg., Inc. v. McCoy Investments, Inc.,*
    846 F. Supp. 2d 732 (S.D. Tex. 2012) ..............................................................................14

*Boire v. Pilot Freight Carriers, Inc.,*
    515 F.2d 1185 (5th Cir. 1975)...............................................................................................8

*Bridgeman Art Library, Ltd. v. Corel Corp.,*
    36 F. Supp. 2d 191 (S.D.N.Y. 1999) ...................................................................................14

*Canal Authority of State of Fla. v. Callaway,*
    489 F.2d 567 (5th Cir. 1974)..................................................................................................7

*Chacon v. Granata,*
    515 F.2d 922 (5th Cir. 1975)..................................................................................................9

*Citibank, N.A. v. Citytrust,*
    756 F.2d 273 (2nd Cir. 1985)................................................................................................8

*Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.,*
    220 F.3d 396 (5th Cir. 2000)...............................................................................................13

*Craigslist Inc. v. 3Taps Inc.,*
    942 F. Supp. 2d 962 (N.D. Cal. 2013) ...............................................................................12

*Cvent, Inc. v. Eventbrite, Inc.,*
    739 F. Supp. 2d 927 (E.D. Va. 2010)..................................................................................21

*Ets-Hokin v. Skyy Spirits, Inc.,*
    323 F.3d 763 (9th Cir. 2003)...............................................................................................14

*Feist Publications Inc v. Rural Telephone Service Co., Inc.*
    499 U.S. 340 (1991) ............................................................................................................13

*Field v. Google Inc.*
412 F. Supp. 2d 1106 (D. Nev. 2006) ...................................................................16

*Grasso Enterprises, LLC v. CVS Health Corp.*,
143 F. Supp. 3d 530 (W.D. Tex. 2015) ..................................................................7

*H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs., LLC*,
2009 WL 1766095 (N.D. Tex. June 23, 2009) ...............................................8, 10

*Harper & Row, Publrs. v. Nation Enters.*,
471 U.S. 539 (1985) ............................................................................................13

*Joseph Paul Corp. v. Trademark Custom Homes, Inc.*,
No. 3:16-CV-1651-L, 2016 WL 4944370 (N.D. Tex. Sept. 16, 2016) ..............8, 9, 10

*Kelly v. Arriba Soft Corp.*,
336 F.3d 811 (9th Cir. 2003) ...............................................................................17

*Kepner-Tregoe, Inc. v. Leadership Software, Inc.*,
12 F.3d 527 (5th Cir. 1994) .................................................................................13

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) ......................................................................................6, 7, 8

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*,
760 F.2d 618 (5th Cir. 1985) ..........................................................................7, 8, 9

*N.Y. Mercantile Exch., Inc. v. Intercontinental Exchange, Inc.*,
497 F.3d 109 (2d Cir. 2007) ................................................................................14

*Parker v. Yahoo!, Inc*,
No. CIV.A. 07-2757, 2008 WL 4410095 (E.D. Pa. Sept. 25, 2008) ....................16

*PCI Trans., Inc. v. Fort Worth & W. RR Co.*,
418 F.3d 535 (5th Cir. 2005) .................................................................................8

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) .............................................................................17

*Plains Cotton Co-op. Ass'n of Lubbock, Texas v. Goodpasture Computer Serv., Inc.*,
807 F.2d 1256 (5th Cir. 1987) .............................................................................10

*Quantlab Techs. Ltd. (BVI) v. Godlevsky*,
719 F. Supp. 2d 766 (S.D. Tex. 2010) .................................................................18

*Reed Elsevier, Inc. v Muchnick*,
559 U.S. 154 (2010) ............................................................................................11

*Rogers v. Better Bus. Bureau of Metro. Houston, Inc.*,
887 F. Supp. 2d 722 (S.D. Tex. 2012) .................................................................12

*Schrock v. Learning Curve Int'l, Inc.*,
   586 F.3d 513 (7th Cir.2009) ........................................................................14

*SHL Imaging, Inc. v. Artisan House, Inc.*,
   117 F. Supp. 2d 301 (S.D.N.Y. 2000) ...........................................................15

*Southwest Airlines Co. v. BoardFirst, L.L.C.*,
   No. 3: 06-CV-0891-B, 2007 WL 4823761 (N.D. Tex. Sept. 12, 2007) ...............10, 19

*Southwest Airlines Co. v. Farechase, Inc.*,
   318 F. Supp. 2d 435 (N.D. Tex. 2004) ............................................................14

*St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*,
   573 F.3d 1186 (11th Cir. 2009) .....................................................................12

*Tanner Motor Livery, Ltd.  v. Avis, Inc.*,
   316 F.2d 804 (9th Cir. 1963) .........................................................................24

*Tough Traveler, Ltd. v. Outbound Prod.*,
   60 F.3d 964 (2nd Cir. 1995) ...........................................................................8

*TrueBeginnings, LLC, v. Spark Network Services, Inc.*
   631 F. Supp.2d 849 (N.D. Tex. 2009) ..............................................................19

*Veeck v. S. Bldg. Code Cong. Int'l, Inc.*,
   293 F.3d 791 (5th Cir. 2002) .....................................................................13, 14

*Waldman Pub.'g Corp. v. Landoll, Inc.*,
   43 F.3d 775 (2d Cir. 1994) ............................................................................14

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008) ..............................................................................8, 9, 10

*Wireless Agents, L.L.C. v. T–Mobile USA, Inc.*,
   No. CIV.A. 3:05-CV-0094D, 2006 WL 1540587 (N.D. Tex. June 6, 2006) ........8, 9, 10

## Statutes

17 U.S.C. § 101 ...............................................................................12, 13

17 U.S.C. § 107 ......................................................................................16

17 U.S.C. § 411 ......................................................................................11

17 U.S.C. § 411(a) ...................................................................................12

17 U.S.C. § 411(b)(1) ...............................................................................12

18 U.S.C. § 1030(a)(2) ..............................................................................18

18 U.S.C. § 1030(a)(4) ........................................................................................................ 18

18 U.S.C. § 1030(e) (11) ..................................................................................................... 19

18 U.S.C. § 1030(g)(4)(A)(i)(I) ......................................................................................... 18

Tex. Civ. Prac. & Rem.Code § 143.001(a) ........................................................................ 19

**Other Authorities**

NIMMER ON COPYRIGHT § 2A.08 .......................................................................................... 14

NIMMER ON COPYRIGHT § 3.07[C] ....................................................................................... 14

PATRY ON COPYRIGHT § 4:48 .............................................................................................. 14

The Court should deny Plaintiffs' Motion for a Preliminary Injunction because Plaintiffs have completely failed to show any likelihood of success on the merits or any irreparable harm, much less the other requirements to obtain such relief.  Plaintiffs delayed bringing suit for five months after discovering the alleged wrongful conduct.  If they were irreparably harmed, they could have sought immediate relief when filing suit.  But they delayed another two months before bringing this motion.  In the interim, Defendants removed Plaintiffs' information and offered a standstill agreement which Plaintiffs rebuffed.  In addition, Plaintiffs have requested relief that is overly broad, illustrating that the true intent of this motion is not to avoid harm or preserve the "status quo," but to impose restrictions on entities Plaintiffs clearly view as competitors.  Plaintiffs are inappropriately competing through litigation by seeking broader relief than they would be entitled to even if they were to prevail after a full trial.

## BACKGROUND

This action concerns Defendant Collectrium's beta online searchable auction database, which is a unique tool enabling art collectors, auction houses, gallery owners, insurers, bank lenders, appraisers, and others to research artwork and collectibles for, *inter alia*, valuation purposes.  Collectrium seeks to follow in the footsteps of innovators such as Google, artnet, Priceline, and Kayak, who aggregate publicly available factual data to create a powerful research tool for the public.  Plaintiffs seek to deprive Defendants of the ability to report historical facts, such as prior auction sales of rare items, and the public of a valuable research tool.

Defendant Collectrium is the leader in providing collection management software, market analytics, and research tools for the rare goods and art professional industry.  Designed specifically for collectors and art professionals by a team of technology and digital security experts, Collectrium

has earned the trust of thousands of clients worldwide.[1]  It is the only platform to integrate a collection care and management system with a database and analytics tools enabling its users to benchmark the value of their collections and assess markets in a single experience that is comprehensive, engaging, mobile, and secure.[2]  Collectrium's subscribers range from amateur collectors to dealers, gallery owners, auction houses, insurers, appraisers and a wide variety of experts in this industry.  Although the majority of Collectrium's users deal in high price-range items typically in the fine art category, Collectrium has expanded its database across all categories of collectibles.[3]

By their intrinsic nature, most auction items are rare.  As a result, market-valuation is extremely difficult and the industry is fraught with ill-informed transactions based on misinformation and fraud.[4]  Accordingly, Collectrium has created its database to resolve many of the missing pieces in market analysis by creating the most comprehensive and innovative analytics and research tool.  This database provides over 12 million searchable auction results from over 1,550 auction houses worldwide.[5]

The Collectrium database is not an aggregation of listings from auction houses.  Instead, Collectrium reviews publicly available information from auction houses to extract historical facts surrounding prior auctions to create an "Abstracted Listing Format" that can subsequently be tagged and cataloged to enable powerful searching and research across the industry.  For example, Plaintiffs' auction listing for Morris Louis' painting *Blue Pillaster II* was previously published in the Collectrium database in the Abstracted Listing Format.[6]  In fact, virtually all of the Heritage

---

[1]   Def. App. 2 ¶ 4. (La Cross Declaration).
[2]   *Id.*
[3]   *Id.* at 2 ¶ 4.
[4]   *Id.* at 2 ¶ 3.
[5]   *Id.* at 2 ¶ 5.
[6]   *Id.* at 3 9 ¶ 6.

auction items appeared on Collectrium's website in that format.[7]   In creating the Abstracted Listing Format, Collectrium extracts facts such as: artist name, title of piece or name of item, medium, dimensions, condition, artist date of birth and death, auction house originating the listing, lot identification number, lot date and location of auction, a thumbnail image, original price estimate, and sold for price.[8]   In all database entries, the original auction house is clearly identified and the reference to that auction house is a "live" hyperlink that links back to the originating auction house listing.   For example, Plaintiffs' exhibits to the Complaint from Collectrium's website reference Heritage Auctions on the listing and provide a hyperlink back to the ha.com website listing so the user can get more information from Plaintiffs.[9]

After extracting these facts, Collectrium uses a number of algorithms and tagging methods to analyze the factual information it has received.[10]   The database's capabilities include powerful searching and filtering tools not offered by other databases.[11]   For example, Collectrium uses an algorithm to display and search "comparables" that look aesthetically similar, where other databases, including ha.com, merely offer items that are similarly priced or similar items based on lot, category or artist.[12]   Collectrium measures trends of valuation over time using factors that other research tools do not trace.   A subscriber researching Amedeo Modigliani, for instance, may view trends measuring Amedeo Modigliani's art in a number of ways.   Collectrium can measure trends in value of Modigliani's art over the span of Modigilani's life, can view interactive heat maps and graphs showing trends over time by geography, sale date, estimated value, actual transaction values, average price, color, dimensions, appreciation from the date of execution, and overall performance

---

[7]   *Id.* at 3 ¶ 7.  The examples Plaintiffs attach to the Complaint were the rare exception caused by technological issues in parsing the original website.  *Id.*  Collectrium has worked towards manually adjusting these pages to conform to the Abstracted Listing Format.

[8]   *Id.* at 3 ¶ 8.

[9]   *Id.* at 3 ¶ 6; Complaint, Ex. D.

[10]   *Id.* at 3 ¶ 8.

[11]   *Id.* at 4 ¶ 9.

[12]   *Id.*; Def. App. 31¶ 5-5, 45-48, 50-56 (Setnick Declaration).

over time.[13]  Filters allow the user to run a number of comparison and analytical reports that make this tool an endless resource for understanding market value.[14]  The database also displays information about relevant auction houses and allows subscribers to easily filter the results *by* auction house, whereby they can click hyperlinks back to the original auction house's website and listings.[15]  Therefore, if one artist or type of artifact or currency is prevalently sold by a particular auction house, this will be obvious to the user.  Collectors can also run a number of reports on their own collections, based on the history of the artists or similar artifacts within the Collectrium database.[16]  The more complete the history of transactions is within the Collectrium database, the more accurate and useful the tool is for everyone.

Defendant Christie's, Inc. ("Christie's") operates as a wholly separate entity from Collectrium.[17]  Although Christie's and Collectrium are affiliated through a common parent, Christie's does not control Collectrium, nor does it direct Collectrium's activities or creation of the Collectrium database.[18]  Christie's does not use Collectrium as a "Trojan horse" to confuse and divert customers from its competition.[19]  In fact, Collectrium does not refer any customers to Christie's to sell their items at auction.[20]

Collectrium values its position as a neutral research and art management company conducting analytics across the entire auction industry.[21]  If anything, its search algorithm for comparables is biased towards the same auction houses from which each item originated.[22]  For example, a listing for a Heritage originated item will tend to show comparables of similar items and

---

[13]   *Id.* at 4 ¶ 8-9; *see also id* at 12-21.
[14]   *Id.*
[15]   *Id.*
[16]   *Id.*
[17]   Def. App. 1 ¶ 2.
[18]   *Id.*
[19]   *Id.*
[20]   *Id.*
[21]   *Id.*
[22]   Def. App. at 4 ¶ 11

any bias will be towards other items from Plaintiffs' auction house, thus directing more traffic back to Plaintiffs.[23]

Christie's runs hundreds of auctions globally every year, and the majority of its sales are in the fine art category, followed by the core categories of furniture and decorative arts, jewelry, gems, and watches.[24]  Christie's, especially in the fine art category, operates in a high price-threshold market, predominantly targeting seven-figure value collectables and offering a lower volume of listings per year than is common in other types of collectable categories.[25]

Although Christie's and Plaintiffs are both auction houses, they are not direct competitors. Plaintiffs predominately operate in different categories from Christie's, such as coins and currency.[26]  While Plaintiffs offer some auction listings in the fine art category, most art they sell relates to animation or collectables in comics.  The core categories of Plaintiffs' auction sales involve lower price-threshold items (coins, currency and specialized memorabilia such as stamps) with the majority of these listings sold at less than $50,000.[27]  Thus, unlike Christie's, Plaintiffs are in a volume-heavy business of lower valued items.

Plaintiffs' website contains a searchable archive of past auction results, which are publicly available without an account.[28]  Plaintiffs' archive does not allow searching or comparing transactions from other auction houses.[29]  Furthermore, Plaintiffs' website archives publicly available price information.[30]  In addition, Plaintiffs frequently publish their auction results, including pricing information, in publicly available catalogs.[31]  In some cases, Plaintiffs only

---

[23]   Def. App. 4 ¶ 6-7.
[24]   *Id.* at 6 ¶ 19.
[25]   *Id.*
[26]   *Id.*
[27]   Def. App. 4 ¶ 10.
[28]   Def. App. 4 ¶ 10 (La Cross Declaration); Def. App. 31 ¶ 55, 45-48, 50-56 (Setnick Declaration).
[29]   *Id.*
[30]   Def. App. 31 ¶ 55, 45-48, 50-56, (Setnick Declaration).
[31]   Def. App. 31 ¶ 55, 45-48, 50-56, 68-71 (Setnick Declaration); Def. App. 6 ¶ 14

provide pricing information if a user creates a free account to login to the website.[32]  However, even these listings frequently appear on third party websites that aggregate auction results such as artnet, Artsy, Live Auctioneers, and ArtInfo.[33]  In fact, Plaintiffs often *pay* for their listings to be publicly featured on these third party databases as a means of advertising their services.[34]

Plaintiffs admit they learned of the conduct for which they now seek preliminary injunctive relief as early as July 2016.[35]  Despite this knowledge, Plaintiffs waited at least five months before commencing this action.  Upon learning of Plaintiffs' claims, Collectrium immediately removed Plaintiffs' auction listings from the Collectrium database out of an abundance of caution.[36]  Initially, when removing the content, Collectrium mistakenly missed a small portion of material referring to Plaintiffs.  As soon as this oversight was pointed out by Plaintiffs, Collectrium immediately removed the remaining content.[37]  Since the initiation of this case, Defendants repeatedly offered a standstill agreement to Plaintiffs, but these efforts were rebuffed.[38]  Despite their delay and Defendants' good faith efforts to avoid the need for this motion, Plaintiffs now belatedly seek the extraordinary remedy of preliminary injunctive relief.

## ARGUMENT

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion."[39]  A court may grant a preliminary injunction only when the movant establishes that: (1) there is a substantial likelihood that it will prevail on the merits of its claims; (2) there is a substantial threat that irreparable harm will result if the injunction is denied; (3) the threatened injury to the movant

---

[32]  Def. App. 30, 33 ¶ 5 (Setnick Declaration).
[33]  Def. App. 31, 62-71 ¶¶ 9-10. (Setnick Declaration).
[34]  Def. App. 27 ¶ 3 (Boyne Declaration).
[35]  Complaint ¶ 17.
[36]  Def. App. 4 ¶ 12 (La Cross Declaration).
[37]  *Id.*
[38]  Opp. ECF No. 27.
[39]  *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (emphasis in original, internal quotations omitted).

outweighs the threatened harm to the defendant; and (4) granting the preliminary injunction will not disserve the public interest.[40]   Plaintiffs cannot establish any of these factors and their motion should be denied.

## I.   PLAINTIFFS' MOTION SHOULD BE DEFERRED TO ARBITRATION

On February 12, 2017, Defendants filed a Motion to Dismiss and Compel Arbitration based on the Website Use Agreement ("WUA") that underlies all of Plaintiffs' claims.[41]   As explained more fully in that motion and Defendants' reply, Plaintiffs' motion requires consideration of the merits of claims that the WUA's arbitration provision reserved for the arbitrator.[42]   There are no exigencies that warrant immediate injunctive relief pending resolution of the motion to dismiss.[43] Therefore, the Court should defer consideration of this motion to the arbitrator.[44]

## II.   PLAINTIFFS CANNOT ESTABLISH IRREPARABLE HARM

Under current case law and the facts in this case, Plaintiffs cannot possibly show irreparable harm.  This is not the typical urgent situation where a plaintiff rushes into court to seek emergency relief to prevent an imminent injury.   Only after waiting for months, during which Defendants voluntarily removed the alleged wrongful content and offered a standstill agreement (which Plaintiffs rejected), did Plaintiffs bother moving this Court for preliminary relief.

Plaintiffs nonetheless allege as a threat of harm that Collectrium *may* send Plaintiffs' materials to individual customers even after Collectrium has removed these materials.[45]   Plaintiffs' alleged harm is based on conjecture and speculation of what may possibly happen in the remote

---

[40]   *Id.; see also, Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) (citing *Canal Authority of State of Fla. v. Callaway,* 489 F.2d 567, 572 (5th Cir. 1974)).

[41]   Opp. ECF No. 27.

[42]   *See* ECF No. 30, pp, 6-8; *see also Grasso Enters., LLC v. CVS Health Corp.*, 143 F. Supp. 3d 530, 543 (W.D. Tex. 2015) ("Simply put, there is no case that would require this Court to issue a ruling on the preliminary injunction motion even though it has ordered the case proceed in arbitration.  Rather, the Fifth Circuit has specifically declined to make such a ruling. … the judicial inquiry requisite to determine the propriety of injunctive relief necessarily would inject the court into the merits of issues more appropriately left to the arbitrator.")

[43]   *See* Defs' Reply ECF 30. pp. 6-8.

[44]   *See generally,* Defs' Reply ECF 30, pp. 6-9.

[45]   Mot. Prelim. Inj. ECF No. 23, pp 5.

future, but is not imminent or supported by facts.  To the contrary, any market-analysis reports that

Collectrium sends to its customers, or the research that customers generate on their own, will pull

solely from the materials and data presently available on Collectrium's database.   Because

Plaintiffs' listings have been removed from that database, they are unavailable for this function.[46]

Consequently, Plaintiffs' concerns of potential future dissemination are unfounded.

Plaintiffs' delay in seeking a preliminary injunction belies any claim of irreparable harm.

Although Plaintiffs knew about the conduct in question at least as early as July 2016,[47] they waited

another five months to commence this action, and two more months before filing the instant motion.

This demonstrates a lack of urgency and shows Plaintiffs did not perceive that Collectrium's

activities were irreparably harming them.   Courts in this circuit have repeatedly held that an

unexplained delay in filing a suit and seeking a preliminary injunction rebuts claims of irreparable

harm and militates against granting relief.[48]  A preliminary injunction is simply not warranted under

such circumstances.[49]

Preliminary injunctive relief may only be granted if a plaintiff can truly "demonstrate that

irreparable injury is *likely* in the absence of an injunction."[50]  In *Winter v. Natural Resources*, the

Supreme Court expressly held that "[i]ssuing a preliminary injunction based only on a possibility of

---

[46]   Def. App. 6 ¶ 12.

[47]   *See* Complaint ¶ 27.

[48]   *See Joseph Paul Corp. v. Trademark Custom Homes, Inc.,* No. 3:16-CV-1651-L, 2016 WL 4944370, at *16 (N.D. Tex. Sept. 16, 2016) ("[T]he court determines that Plaintiff's unexplained and undue delay of approximately six months strongly undercuts its claim of irreparable harm and contention regarding the need for urgent relief.") (*citing Boire v. Pilot Freight Carriers, Inc.,* 515 F.2d 1185, 1193 (5th Cir. 1975) (affirming district court's denial of temporary injunctive relief where movant, among other things, delayed three months in making its request); *H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs., LLC,* No. 3:09–CV–00390–L 2009 WL 1766095, at *4-5 (N.D. Tex. June 23, 2009) (delay of five months after discovering infringement weighed against irreparable harm) *citing Wireless Agents, L.L.C. v. T-Mobile USA, Inc.,* No. CIV.A. 3:05-CV-0094D, 2006 WL 1540587, *3 (N.D. Tex. June 6, 2006); *see also, Tough Traveler, Ltd. v. Outbound Prod.,* 60 F.3d 964, 968 (2nd Cir. 1995) (vacating preliminary injunction where movant waited four months to seek a preliminary injunction after filing suit); *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2nd Cir. 1985) (ten week delay in seeking injunction for trademark infringement undercut claim of irreparable harm).

[49]   *Winter*, 555 U.S. at 22 (citing *Mazurek*, 520 U.S. at 972).

[50]   *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis added);  *see also PCI Trans., Inc. v. Fort Worth & W. RR Co.*, 418 F.3d 535, 546 (5th Cir. 2005);("[t]he plaintiff has the burden of introducing sufficient evidence to justify the grant of a preliminary injunction."); *Miss. Power & Light*, 760 F.2d at 621 ("The decision to grant a preliminary injunction is to be treated as the exception rather than the rule.").

irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a *clear showing* that the plaintiff is entitled to such relief."[51] Plaintiffs cannot meet this standard.  To prove irreparable injury, Plaintiffs must establish (1) the harm to Plaintiffs is imminent (2) the injury would be irreparable and (3) that Plaintiffs have no other adequate legal remedy.[52]  "No individual factor is dispositive, and the court 'must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested."[53]  Plaintiffs fail to establish any of these elements.

Plaintiffs raise two speculative bases for irreparable injury: 1) possible diversion of customers; and 2) possible higher bids at auction.  Neither is supported by the facts.  Plaintiffs suggest that customers viewing Plaintiffs' items on Collectrium's site may falsely attribute such items to Collectrium and in turn would submit their own items to Christie's out of convenience.[54] This conjecture is the exact type of "possible" harm that *Winter* expressly rejects.[55]  Not only is there no evidence to corroborate such speculation, but every Heritage item on Collectrium's website was specifically credited to Plaintiffs and was linked back to the original listing on Plaintiffs' website ha.com, so Collectrium users (which likely includes customers that do not normally access ha.com) were *driven* to Plaintiffs' website.[56]  Furthermore, even if Plaintiffs could establish likely diversion of customers to Christie's, they have not explained why any such losses could not be recoverable as legal damages.[57]

Plaintiffs further speculate that *if* Collectrium consumers had visited ha.com instead of Collectrium (there is no evidence they would have), they *might* see other items Plaintiffs currently

---

[51] *Id.* (emphasis added).
[52] *Joseph Paul Corp.*, 2016 WL 4944370 at *13 (*citing Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975)).
[53] *Wireless Agents,* 2006 WL 1540587, at *1.
[54] Mot. Prelim. Inj. ECF No. 23 pp 17-18.
[55] *Winter,* 555 U.S. at 22.
[56] Def. App. 4-5 ¶¶ 9-10.
[57] Notably, Plaintiffs did not move for a preliminary injunction on their unfair competition claim or their contract claim.  They only moved pursuant to their copyright and computer violation claims.

are selling at auction, and *might* bid on such items (assuming they were interested), which *may* drive up the bidding price (presumably to Plaintiffs' benefit).[58]  Of course there is no basis for any of these suppositions.   Moreover, as discussed, Collectrium actually drives users to Plaintiffs' website, so even assuming they were researching a Heritage item, they would have been driven back to Plaintiffs' website and could then be exposed to other Heritage items.   Plaintiffs have presented no evidence showing their speculative outcome is more than a theoretical possibility.   In addition, the data that Plaintiffs seek to remove from Collectrium is also published on third-party websites such as Artnet.[59]   The fact that Plaintiffs allow this same data on third party websites undercuts their arguments of likely injury.

Rather than provide evidence, Plaintiffs rely on *Southwest Airlines Co. v. BoardFirst,* a pre-*Winter* case*,* for the proposition that the *potential* loss of reputation, good will, and business opportunities may constitute irreparable injury.   This Court has expressly rejected such a presumption of irreparable harm.[60]   Moreover, the *Southwest* court had evidence beyond mere speculation to support its holding.   There, the court relied on expert testimony showing probable loss of advertising revenue in the context of a breach of contract claim.   The evidence showed more than a mere "possible" loss of opportunity.[61]   The court also refused to grant summary judgment on the CFAA claim and the Harmful Access claim because evidence of injury and loss had not been established by the claims of lost business opportunities.[62]   Additionally, unlike the plaintiff in

---

[58]   Mot. Prelim. Inj. ECF No. 23, Pp. 17-18.

[59]   Def. App. 30 ¶ 31; 62-29 (Showing Plaintiffs' listing for *Blue Pillaster II* on third party auction listing aggregator websites).

[60]   *Joseph Paul Corp.* at *13 (*citing H.D. Vest, Inc.*, 2009 WL 1766095, at *4 (N.D. Tex. June 23, 2009) ("Assuming without holding that Plaintiff established a substantial likelihood of prevailing on the merits..., the court rejects its argument that a substantial threat of irreparable injury is to be presumed in such a case.  The Fifth Circuit has not so held…"); *Plains Cotton Co-op. Ass'n of Lubbock, Texas v. Goodpasture Computer Serv., Inc.*, 807 F.2d 1256, 1261 (5th Cir. 1987) (rejecting presumption of irreparable harm in copyright case).

[61]   *Sw. Airlines Co. v. BoardFirst, L.L.C.*, No. 3: 06-CV-0891-B, 2007 WL 4823761, at *9 (N.D. Tex. Sept. 12, 2007).

[62]   *Id.* at *17.

*Southwest,* Plaintiffs do not point to any actual evidence demonstrating why their alleged injury based on copyright or computer fraud claims cannot possibly be quantifiable.

Given the speculative nature of Plaintiffs' alleged harms and the lack of urgency shown by their delay in seeking preliminary injunctive relief, Plaintiffs cannot establish irreparable harm. That by itself is sufficient grounds for denying Plaintiffs' motion.

## III.   THERE IS NO LIKELIHOOD OF SUCCESS ON THE MERITS

### A.   Plaintiffs Present No Factual Allegations Regarding Defendant Christie's

Plaintiffs' conflate their allegations of misconduct against Defendant Christie's and Defendant Collectrium as if the entities are one and the same.  However, all the alleged wrongdoing raised in this motion pertains only to Collectrium's online database.  Even if the Court accepts all of Plaintiffs' factual allegations, they have adduced no evidence or argument concerning Christie's, so Plaintiffs cannot establish a likelihood of success against Christie's.  Plaintiffs have not explained why injunctive relief is necessary against a party they do not allege to be engaged in conduct causing the alleged irreparable harm.[63]

### B.   Plaintiffs Cannot Prevail on Their Copyright Claim

#### 1.   *Plaintiffs Have Not Established What Their Registrations Cover*

Plaintiffs make a blanket claim of copyright ownership based on registrations ostensibly covering various aspects of Plaintiffs' website.  But Plaintiffs have provided no evidence as to what their registrations cover.   Valid copyright registrations that protect the allegedly infringing copyrighted works are a prerequisite to filing suit.[64]   However, Plaintiffs have not provided evidence that any of the "millions" of images or descriptions allegedly copied have been registered with the Copyright Office, which is what the law requires.  Plaintiffs have not supplied a single

---

[63]   To the extent Plaintiffs raise improper new arguments in their reply, Defendants will seek leave to file a sur-reply to address any new arguments regarding Defendant Christie's.

[64]   17 U.S.C. § 411; *see also Reed Elsevier, Inc. v Muchnick,* 559 U.S. 154,166 (2010) (holding registration requirement is a precondition to filling a copyright infringement claim).

copy of what they supposedly deposited with the Copyright Office, and if the Court were to rely on Plaintiffs' bare boned descriptions of the registrations, several questions arise as to the validity of at least some of those registrations due to improper overlapping content and questionable publication dates.[65]  Without knowing precisely what Plaintiffs claim to be protected by copyright, Defendants cannot adequately defend themselves.  Moreover, Plaintiffs do not correlate even one image or description, let alone the millions of allegedly infringed materials cited in the Complaint, with any of the asserted registrations.

Even if the copyright registrations cover Plaintiffs' entire website, they have not established what protectable elements are covered by the registrations.  By Plaintiffs' own admission some images and descriptions are submitted by independent contractors.[66]  Without evidence of valid written assignments or work for hire agreements, ownership of each of those works automatically vests in the third parties who created the works, and not with Plaintiffs.[67]  Since many of the registrations explicitly cover derivative works,[68] some aspects of Plaintiffs' website may well contain preexisting works owned by third parties.  In many cases, the written text appears to be excerpts and quotes from various resources that Plaintiffs do not appear to have any claim to own.[69]

---

[65]   17 U.S.C. § 411(a), (b)(1); *St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186 (11th Cir. 2009) (Applicant's misrepresentations in its first and second copyright applications for two versions of a website rendered the registrations invalid:"[T]he jury was free to decide as a question of fact ... whether it was a material omission for [plaintiff] not to disclose that it had registered substantially the same version of the [copyrighted material] several months earlier."); *see also Rogers v. Better Bus. Bureau of Metro. Houston, Inc.,* 887 F. Supp. 2d 722, 731-32 (S.D. Tex. 2012) (Holding that uploading material does not count as publication to a website, discussing circuit split on publication requirements for websites.  The court recognized that the Copyright Office defers to applicant's statement as to publication date but further investigation may sometimes be necessary. "The definition of "publication," as discussed above, includes public distribution of copies of a work only in cases of "sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 101. This includes the offer to distribute copies to a group for further distribution.).

[66]   Complaint ¶ 17.

[67]   *Craigslist Inc. v. 3Taps Inc.,* 942 F. Supp. 2d 962, 974 (N.D. Cal. 2013) (Craigslist could not maintain a copyright infringement claim over scraped user generated content because it did not have an exclusive license or valid assignment).

[68]   *Id.*

[69]   *See, e.g.*, Complaint Exh. A; Def. App. 31 ¶ 9.(Setnick Declaration) (*Blue Pillaster II* listing on Ha.com)

Thus, Plaintiffs have not established that they own the allegedly copyright-protectable materials on which they base their copyright infringement claim.

In addition, many aspects of Plaintiffs' website are not subject to copyright protection: "The most fundamental axiom of copyright law is that no author may copyright his ideas or the facts he narrates."[70]   Where a work combines both original and non-original elements, "[t]he copyright is limited to those aspects of the work—termed 'expression'—that display the stamp of the author's originality," and does not extend to the non-original components of the work.[71]   Actionable copying requires a showing that the copied elements of the work are protectable expression.  Further, in some cases even expression may not be protectable where there are limited ways to express an idea.  The merger doctrine holds that if there is only one way or a few ways to express an idea, then the idea and the expression have inseparably *merged*.[72]   Thus, the merger doctrine holds that copyright law may not protect that expression because "do[ing] so would confer a de facto monopoly over the idea."[73]   Similarly, circuits have long recognized, "the *scenes a faire* doctrine excludes from copyright protection work serving functional purposes or work that is dictated by external factors such as particular business practices."[74]   Plaintiffs are not entitled to injunctive relief where the alleged copying relates solely to material not subject to copyright.[75]

Plaintiffs seek a vague and overly broad injunction over "auction item descriptions, auction item sales prices, images, information and data."  But prices are non-protectable facts and neither

---

[70]   *Feist Pubs. Inc. v. Rural Telephone Svc. Co., Inc.* 499 U.S. 340, 344-45 (1991) (internal quotations omitted).

[71]   *Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 599 (1985); *see Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 533 (5th Cir. 1994); ("[A]ctionable copying, [] is the copying of constituent elements of the work that are copyrightable.").

[72]   *See e.g., Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 801 (5th Cir. 2002) ("If an idea is susceptible to only one form of expression, the merger doctrine applies and § 102(b) excludes the expression from the Copyright Act. As the Supreme Court has explained it, this "idea/expression dichotomy strike[s] a definitional balance between the First Amendment and the Copyright Act by permitting free communication of facts while still protecting an author's expression.").

[73]   *Kepner-Tregoe, Inc.*, 12 F.3d at 533.

[74]   *See Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.*, 220 F.3d 396, 401 (5th Cir. 2000).

[75]   17 U.S.C § 101.

are the undefined "data and information."[76]   Virtually all of Plaintiffs' listings on the Collectrium

database include only the list of facts on the "Abstracted Listing Format" illustrated by *Appendix 8-*

*9,* which shows Plaintiffs' auction listing for *Blue Pillaster II.*[77]   The itemized "descriptions" for

this work are just facts describing the history of that transaction.   A viewing of other auction houses

illustrates that such facts are expressed in the same way and the compilation of these bare minimum

descriptions are subject to the merger doctrine or the doctrine of *scène à faire.*[78]   In other words, it

is impossible to describe this particular auction item without at least these facts in the way that they

are expressed.   For example, settlement prices, or valuations, were held non-protectable under the

merger doctrine, because when given proper market indicia, the calculations yielded similar results

and therefore lacked creative expression.[79]   When reporting auction results, price estimates and their

correlation to the actual transactions are simply facts denoting the market value of the items.

Photographs of commercial objects are only entitled to thin copyright protection.[80]   In many

cases, the individual photographs are merely head-on shots of a preexisting work, such as a

painting, and the photograph itself would not be entitled to any protection beyond the preexisting

work.[81]   Moreover, the merger doctrine applies here too, as without the use of thumbnail images, it

---

[76]   *See e.g., S.w. Airlines Co. v. Farechase, Inc.*, 318 F. Supp. 2d 435, 441 (N.D. Tex. 2004) (finding that the scraped content of fares, route, and scheduling information is not protectable by copyright); *Veeck,* 293 F.3d 791, 802 (building codes could only be expressed in one way and thus they were facts within the meaning of the merger doctrine).

[77]   App 2. 9 ¶ 6 (La Cross Declaration) (*Blue Pillaster II* on Collectrium database).

[78]   Def. App. 31 ¶¶ 7-8; 57-58 60-61 (Setnick Declaration) (Exhibit showing other auction house listings).

[79]   *See N.Y. Mercantile Exch., Inc. v. Intercontinental Exchange, Inc*., 497 F.3d 109, 118 (2d Cir. 2007) (holding that settlement prices (valuations) were not protected by copyright due to the merger doctrine, and the expression of those valuations, despite control by plaintiff through fee-based subscriber databases, could not be protected by copyright); *see also* §2 PATRY ON COPYRIGHT § 4:48 ("Apart from a compilation interest in an original selection, coordination, or arrangement, there is no copyright associated with individual product numbers or valuations.").

[80]   *Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 765-66 (9th Cir. 2003) (photos of commercial products only have "thin" copyright protection); *see also, Axxiom Mfg., Inc. v. McCoy Investments, Inc*., 846 F. Supp. 2d 732, 746 (S.D. Tex. 2012)("A derivative work's copyright "is thin, extending only to the incremental original expression contributed by the author of the derivative work.) (quoting *Schrock v. Learning Curve Int'l, Inc.,* 586 F.3d 513, 521 (7th Cir.2009); *accord, e.g., Waldman Pub.'g Corp. v. Landoll, Inc.,* 43 F.3d 775, 782 (2d Cir. 1994) ("In the case of a derivative work based on an underlying work that is in the public domain, only the material added to the underlying work is protected by copyright." (citing 1 NIMMER ON COPYRIGHT § 3.07[C] )).

[81]   *See e.g., Bridgeman Art Library, Ltd. v. Corel Corp.*, 36 F. Supp. 2d 191, 196 (S.D.N.Y. 1999) (denying copyright protection where transparencies of famous paintings merely slavishly copied original artwork); *see also* 1-2A

becomes impossible to describe certain auction listings—the title of the painting, artist name and price information is not enough to describe the transaction.   For rare auction items, these photographs are likely the only way to obtain an existing *accurate* image of each item's most recent and market-value relevant *condition*.

## 2.     *Plaintiffs Have Impliedly Licensed Their Website Content*

Plaintiffs are not entitled to injunctive relief because they impliedly licensed the materials in question.   In publishing their website, Plaintiffs implemented what is known in the industry as the "Robot Exclusion Protocol."   This protocol resides in a file called robots.txt on Plaintiffs' web server.[82]   This protocol directs third party robots/bots/spiders/crawlers/scrapers as to what content is allowed to be scraped and what content is prohibited.   Plaintiffs incorporate a robots.txt file on their web server instructing third party crawlers to exclude only certain limited pages from their scraping activities.[83]   The protocol and industry practice dictate where certain pages are excluded in robots.txt, but the remainder of the website may be copied.[84]   The protocol also allows for specifying a blanket exclusion of the entire website, however Plaintiffs did not do so here.[85]   None of the alleged infringing content appears to come from the excluded portions of Plaintiffs' website.[86]

Courts have recognized an implied license where, as here, a website operator implements the Robot Exclusion Protocol and does not exclude the content alleged to be infringing.   In those cases,

---

NIMMER ON COPYRIGHT § 2A.08 ("Photograph of another photograph that amounts to nothing more than slavish copying lacks the requisite originality to qualify for protection. Because that copying does not produce a distinguishable variation, it fails the originality requirement for qualifying as a derivative work."); *see also SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301, 306 (S.D.N.Y. 2000)(A photograph that receives copyright protection as a derivative work "must incorporate a substantial element of a preexisting work of authorship and recast, transform, or adapt those elements.").

[82]   Def. App. 5 ¶ 15, (La Cross Declaration Exhibit 1-C Robots.txt).
[83]   *Id.*
[84]   *Id.*
[85]   *Id.*
[86]   Def. App. 6 ¶ 16,  (La Cross Declaration Exhibit 1-D).

courts have found that an implied license and/or equitable estoppel defeats the copyright claims.[87]

Moreover, it is a known practice within this industry that auction listing aggregators and other auction houses use web crawlers to gather information from auction houses.[88]   Accordingly, Plaintiffs should have reasonably anticipated Defendants' spiders as evidenced by their deployment of a robots.txt file.[89]   Knowing about these industry-wide practices Plaintiffs impliedly licensed use of their content to third party auction market data aggregators, such as Collectrium.

3.   <em>Collectrium's Use of Plaintiffs' Information Is Fair Use</em>

In creating its database, Collectrium sought to extract abstract listings of prior sales to be incorporated into a powerful research tool to enable users to conduct valuations of art and other collectibles.   This use of Plaintiffs' auction listings in the Collectrium database is permitted by the statutory exception of fair use.[90] The four factors for evaluating the fair use defense to copyright infringement are: (1) purpose and character of use, which requires evaluating whether and to what extent new work is transformative; (2) nature of the copyrighted work; (3) amount and substantiality of portion used in relation to copyrighted work as a whole; and (4) effect of use on potential market for or value of copyrighted work.[91]

Here, the purpose of Collectrium's use of Plaintiffs' data is transformative.   Collectrium built a comprehensive database by taking the abstract facts from auction listings, tagging them, and building an algorithm that allows users to conduct powerful searches and apply filters across the

---

[87]   *See, e.g., Field v. Google Inc.* 412 F. Supp. 2d 1106 (D. Nev. 2006) (Google successfully defeated claims of copyright infringement under the doctrine of implied license and fair use where plaintiff filed to incorporate "no-archive" meta-tag s, knowing that Google's bots would archive anything that it was not instructed otherwise); *see also, Parker v. Yahoo!, Inc*, No. CIV.A. 07-2757, 2008 WL 4410095, at *4 (E.D. Pa. Sept. 25, 2008) (the district court relied on the implied license defense to defeat infringement claims).

[88]   Def. App. 6 ¶ 17, (La Cross Declaration). (A known aggregator of auction listings that often features Plaintiffs' listings, Artsy, published its own scraping program online over two years ago).

[89]   Def. App. 5 ¶¶ 14-17 (La Cross Declaration).

[90]   17 U.S.C. § 107; *see e.g., Authors Guild, Inc. v. Google Inc.,* 954 F. Supp. 2d 282, 287-88 (S.D.N.Y. 2013), *aff'd sub nom. Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015)(Search engine engaged in fair use in digitally reproducing millions of copyrighted books, making them available for its library project partners to download, and displaying "snippets" from the books to the public.).

[91]   *Id; Am. Inst. of Physics v. Winstead PC*, No. 3:12-CV-1230-M 2013 WL 6242843, at *6 (N.D. Tex. Dec. 3, 2013) (holding that articles copied in their entirety by Defendant was transformative and constituted fair use).

entire auction industry to conduct research on artwork for, *inter alia*, valuation purposes.[92]   For example, Collectrium allows users to search by artwork created within a certain period of a specific style across all auction houses to find comparable sales.  It also algorithmically matches particular pieces with comparable pieces for valuation purposes.[93]   In addition, data is used to create industry wide analytics, such as sales trends for a particular artist.[94]   For example, Appendix 12 illustrates an auction result search where the analytics sidebar demonstrates the relevant trends in market value.[95] This factor supports a finding of fair use.

Moreover, as discussed *supra*, in virtually all cases, Collectrium only extracted historical facts regarding the prior sale (e.g., lot, sale date, price, dimensions of work, etc.).  These facts are likely not even protectable by copyright and even if they are, they relate solely to minimum factual descriptions of the item being sold.  Even the photographs, to the extent they are protectable, were republished as thumbnails only to let the user know what the work in question was.  Such uses are fair use.[96]   As such, both factors two and three favor a finding of fair use.

Finally, Plaintiffs and Defendant Collectrium do not use Plaintiffs' listings for the same purpose and thus the use by Collectrium cannot possibly usurp the market for the original works.[97] Virtually all of Defendants' listings appear in abstract form on Collectrium's website.  Users use this data to value their art work and find comparables.  The users are then prompted to visit the original listing on Plaintiffs' website for further information.   Moreover, the algorithm for determining comparables actually biases toward the original auction house, so viewing Plaintiffs'

---

[92]   Def. App. 3-4 ¶ 9; 9-21 (Exhibit 1-B)
[93]   *Id.*
[94]   Def. App. 3-4 ¶ 9, 12-15,17
[95]   Def. App. 12.
[96]   *See, e.g.*, *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003); *accord Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1168 (9th Cir. 2007) (both finding recreation of thumbnail images in search application to be fair use).
[97]   *Am. Inst. of Physics*, 2013 WL 6242843, at *11 ("Defendants meet their initial burden to establish an affirmative defense under factor four when they present evidence that their actions have no significant impact on the market for Plaintiffs' original articles.").

items on Collectrium's website will tend to generate more traffic to Plaintiffs' website.[98]  Thus, the Collectrium database actually drives traffic to the original website.  This is further supported by the fact that Plaintiffs' listings (even in their full form similar to the exhibits attached to the Complaint), appear on a variety of third party websites.[99]  In fact, Plaintiffs pay third parties to feature their listings publicly, since this provides further advertising for Plaintiffs, contrary to their claim that these listings could have been licensed for substantial fees.[100]  Thus, this factor also supports a finding of fair use.

### C.   Plaintiffs Are Unlikely to Succeed on Their Computer Fraud Claims

To succeed on the merits of their Computer Fraud and Abuse Act claim, Plaintiffs must at a minimum show that Defendants "intentionally accesse[d] a computer without authorization or exceed[ed] authorized access, and thereby obtain[ed] - information from any protected computer" and they were thereby harmed[101] or "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period."[102]  As a threshold matter, Plaintiffs must establish that they incurred "loss" aggregating at least $5,000 in value.[103]  Under the CFAA "loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and

---

[98]   Def. App. 4-5 ¶ 9.
[99]   Def. App. 30 ¶ 31; 62-29 (Showing Plaintiffs' listing for *Blue Pillaster II*  on third party auction listing aggregator websites).
[100]   Def. App. 5.¶ 14, Def. App. 30 ¶ 31; 62-29 (Showing Plaintiffs' listing for *Blue Pillaster II*  on third party auction listing aggregator websites); Def. App. 27 ¶ 3 (Declaration Boyne).
[101]   18 U.S.C. § 1030(a)(2).
[102]   18 U.S.C. §1030(a)(4).
[103]   18 U.S.C. § 1030(g)(4)(A)(i)(I); *see also Alliantgroup, L.P. v. Feingold*, 803 F. Supp. 2d 610, 630 (S.D. Tex. 2011) (Employer could not prevail against former employee because they did not bring evidence of cognizable loss to meet the $5,000 threshold showing that they incurred to investigate or respond to service interruptions); *Quantlab Techs. Ltd. (BVI) v. Godlevsky*, 719 F. Supp. 2d 766, 776 (S.D. Tex. 2010) (Although Quantlab alleged facts related to the examination of a the portable hard drive used by Plaintiff, there were no facts alleged with respect to further forensic examinations or costs associated therewith and as a result the Complaint did not contain sufficient facts to support a claim of loss under the CFAA.).

restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."[104] This loss requirement is separate from the injury of damages.

Under the Texas Harmful Access by Computer statute, Plaintiffs must establish that Defendants knowingly or intentionally accessed a "computer, computer network, or computer system without the effective consent of the owner" and this access caused injury or damage to property.[105] Additionally, "injury" as defined under the Texas statute cannot be met by alleging the "loss" incurred through investigation or response to the conduct such as under the CFAA.[106]

>1.   *Plaintiffs Fail to Establish Requisite Injury*

Plaintiffs fail to prove injury or the requisite loss necessary for establishing a *prima facie* violation of either of the asserted computer violations claims.[107]   First, Plaintiffs have not adequately shown that their so-called investigative costs were anything more than normal overhead. Plaintiffs merely cite their CEO's uncorroborated, self-serving statement claiming the investigation cost more than $5,000.[108]   This Court has found that merely pointing to the testimony of an employee alleging investigating and responding to scraping activities was not sufficient if that testimony does not detail how the investigative steps correlate to the alleged costs.[109]

Moreover, Plaintiffs allege inconsistent claims as to damages resulting from the alleged computer violations.  Their Complaint claims they have suffered $75,000 in *economic* damages due to Defendants' access, but Plaintiffs now claim that any loss incurred by the scraping activities is unquantifiable and they have no actual evidence of customers loss or diversion of business or

---

[104]   18 U.S.C. § 1030(e)(11); *see generally BoardFirst, L.L.C.*, 2007 WL 4823761, at *16.
[105]   Tex. Civ. Prac. & Rem.Code § 143.001(a).
[106]   *See BoardFirst, L.L.C.,* 2007 WL 4823761, at *16.
[107]   *See e.g. TrueBeginnings, LLC, v. Spark Network Svcs.*, Inc., 631 F. Supp.2d 849, 856 (N.D. Tex. 2009) (Plaintiff failed to prove that it suffered any damages when defendant accessed its website under false pretenses).
[108]   ECF No. 23 p. 5, App 5 ¶13.
[109]   *See BoardFirst, L.L.C.*, 2007 WL 4823761, at *16.

advertising opportunities.[110]  Plaintiffs cannot claim economic damages without evidence of where those damages came from, and then claim it is *impossible* to calculate monetary damages and assume it is not necessary to provide any evidence of actual harm.  Plaintiffs do not allege any actual impairment or damage to their network, computers, software or data as a result of the alleged scraping.  Again, Plaintiffs attempt to rely on mere conjecture by asserting that crawling software has, in the realm of possibilities, been known to cause damage to websites and overburden the networks without actually identifying such harm.[111]  But without evidence of damages, Plaintiffs cannot succeed.

2.    *Plaintiffs Cannot Establish That Defendants Accessed Their Website Without Authorization or Exceeded Authorized Access*

When Collectrium obtained virtually all of the Plaintiffs' information, it did so from Plaintiffs' public website without creating any user accounts, so the question of "unauthorized access" is irrelevant.[112]  Plaintiffs make most of their information, with the exception of *some* of the price information, available to the public without requiring any form of log-in.[113]  Price information is available after creating a free user account.[114]  In some cases, the price information is temporarily available without a log-in, and select listings are continuously available publicly without a log-in.  As Plaintiffs note in their own requested relief, auction listings with this so-called "protected" information is also widely available on third party websites, including art database and price aggregators.[115]

Plaintiffs fail to establish that Defendants' access of the publicly available website exceeds the "intended use" or "effective consent" of the website under either statute.  They have provided no evidence that Defendants agreed to the WUA or that Defendants were even aware of the provisions

---

[110]    *Compare* Complaint ¶ 73 with ECF No. 23 pp. 18.
[111]    Mot. Prelim. Inj. ECF No. 23, Decl. Brian Shipman at ¶ 7.
[112]    Def. App. 30 ¶ 11; 70-71.
[113]    Def. App. 30 ¶ 6; 49-56.
[114]    Def. App. 30 ¶ 6; 45-48.
[115]    ECF No. 20 pp. 21.

of this agreement when they copied the publicly available information. In fact, the WUA is inconspicuously placed and not easily accessible by users of ha.com.[116] A link to the WUA is not present on the homepage of ha.com.[117] Finding the WUA is a treasure hunt requiring that a user first click on the "Privacy Policy" and then from that page, the user can click "View Website User Terms" to bring up the WUA.[118] Where a website fails to provide adequate notice of the terms, "browsewrap" agreements like the WUA have been found unenforceable.[119] Regardless, the contradictory nature of the language in the WUA (which lacks an integration clause)[120] and the robots.txt protocol published by Plaintiffs demonstrates that "intended use" of the website may be interpreted or implied in a number of ways, including how Collectrium used the website.

Therefore, Plaintiffs cannot establish that Defendants "exceeded" the intended or authorized use required for the CFAA or the "effective consent" under the Texas statute.

## IV.    THE BALANCE OF EQUITIES WEIGHS IN DEFENDANTS' FAVOR

Plaintiffs claim that the balance of equities weighs in their favor because if the motion to compel arbitration is granted, Plaintiffs will not be able to request this type of relief from the arbitrator. But Plaintiffs have cited no law supporting this argument. To the contrary, as Defendants have argued above, the arbitrator is well within his/her right to grant this type of relief.[121] Moreover, Plaintiffs cannot establish any urgency that requires such extraordinary relief. Were Plaintiffs faced with such a hardship, they would have filed suit and sought an injunction

---

[116] *See* Def. App. 30 ¶ 4; 37 (Setnick Declaration), showing that the homepage of ha.com does not provide a conspicuous link to the WUA. In fact, finding the WUA requires that a user first click on "Privacy Policy" and then from that page, click "View Website User Terms." Although the breach of contract claims are not at issue in this motion, Defendants maintain that there was no meeting of the minds forming a valid agreement that bounds Defendants to the WUA and therefore binding Defendants to the Prohibited Use" provision prohibiting the use of spiders.

[117] *See* Def. App. 30 ¶ 3; 37.

[118] *See* Def. App. 30 ¶ 3; 42

[119] *C.f., Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 937 (E.D. Va. 2010).

[120] ECF No. 17 Def. App. 4 (WUA).

[121] ECF 30, pp. 6-9.

almost seven months earlier.  The lack of urgency underscores the lack of hardship to Plaintiffs in waiting for final relief.

In contrast, the hardship to Defendants would be great.  Plaintiffs broadly seek to enjoin the use of non-protectable historical facts.  Although Collectrium offered to, and in fact did, remove the alleged infringing content, Plaintiffs seek to enjoin even use of historical sales information that is publicly available.  Plaintiffs' proposed injunction even states that they seek to prevent Defendants from using any of their information, "including but not limited to Plaintiffs' copyrighted works."[122] But they cite no basis for such a broad prohibition that goes beyond the scope of legal protection. For example, under Plaintiffs' proposed injunction, Defendants could not even view a webpage on Plaintiffs' site to obtain an item's latest sale price or date.  Any art expert or collector conducting a valuation as part of their normal industry due diligence, would need to review sales information available in the marketplace.[123]  Plaintiffs seek to enjoin not merely usage of copyright protected content (assuming they establish protectability and ownership), but also seek to enjoin usage of mere unprotected facts (e.g., "auction item descriptions, auction item sales prices, images, information, and data").[124]  Defendants would be enjoined from relying on any publicly available unprotected facts that any other auction house or market analytics company could properly rely upon in conducting their business.  Furthermore, Plaintiffs seek to enjoin Defendants from using facts based on mere speculation of what Defendants *might* do in the future, rather than illustrating why any actual harm requires injunctive relief now.  The real intent behind this injunction request is not to avoid unquantifiable harm, but actually to stop Defendants from operating their respective businesses.

---

[122]  ECF No.23.
[123]  Def. App. 5 ¶ 14. (La Cross Declaration).
[124]  Mot. Prelim Inj. ECF No. 23. (proposed order).

## V. THE PUBLIC INTEREST WILL NOT BE SERVED THROUGH ISSUANCE OF A PRELIMINARY INUNCTION

Plaintiffs argue that the public interest weighs in their favor because (1) the public benefits when laws are enforced, and (2) injunctive relief will prevent collectors from "entrusting their valuable collectibles to a company that they believe to have greater knowledge of certain types of collectible than that company does because the descriptions displaying such knowledge were written by Heritage."[125]  First, Plaintiffs are not merely seeking to enforce laws (*e.g.*, to enjoin use of copyright protected information).  Instead, they seek broad relief to extend copyright protection to cover use of unprotected information to the detriment of the public.  Not only does this unlawfully extend copyright protection to unprotectable facts, it also undermines a well-established practice in the industry that could disrupt major service providers such as Google, Priceline, and Kayak.  Second, Plaintiffs make unsubstantiated assumptions about the beliefs and conduct of Collectrium subscribers.  There is no reason to believe that upon viewing any Abbreviated Listing Format of a Heritage item that a user will associate this item with Christie's.  Plaintiffs argue that Defendants publish their information without crediting Plaintiffs.  But this is untrue.  Each Heritage item appearing on Collectrium's website was credited to Plaintiffs and a link was provided back to the original listing on Plaintiffs' website.[126]  In addition, comparable listings from Plaintiffs would be displayed in the sidebar, further crediting Plaintiffs.  Granting a preliminary injunction deprives the public of a market analytics research tool that until now was not available to art dealers, appraisers, gallery owners, collectors, investors, lenders, insurers, insurers and tax adjusters.  Ensuring both access and the accuracy of the Collectrium database encourages innovation in this industry and discourages fraud and transactions based on misinformation, which is ultimately in the public's best interest.

---

[125]   ECF No. 33, at 20.
[126]   Def. App. 4-5 ¶ 9. (La Cross Declaration).

## CONCLUSION

The purpose of a preliminary injunction is to preserve the *status quo* while the parties litigate the merits of the dispute.[127]  Collectrium has already removed Plaintiffs' listings from the Collectrium database.  Thus, Plaintiffs seek not to preserve the status quo, but to <u>change</u> it by asking this Court to enjoin Defendants from using non-protectable facts and consequently prohibiting Defendants from conducting business in a way that does not affect Plaintiffs.  However, Plaintiffs cannot even establish irreparable harm or a likelihood of success on the merits.  Moreover, the balance of hardships and public interest weighs against granting this extraordinary and drastic remedy.  Thus, the Court should deny Plaintiffs' motion for a preliminary injunction.  In the alternative, the Court should defer any consideration of this remedy to the arbitrator.

Respectfully Submitted,

**ANDREWS KURTH KENYON LLP**

*/s/ Benjamin J. Setnick*
Benjamin J. Setnick
Texas State Bar No. 24058820
Email: bensetnick@andrewskurth.com
1717 Main Street, Suite 3700
Dallas, Texas 75201
Telephone:  214-659-4400

**ATTORNEYS FOR DEFENDANTS**

---

[127]   *Tanner Motor Livery, Ltd.  v. Avis, Inc.*, 316 F.2d 804, 808 (9th Cir. 1963).

Of counsel:

Erik C. Kane
Email: EKane@kenyon.com
1350 I Street, NW, Suite 1100
Washington, DC 20005
Telephone:  202-662-3039

Jessica Cohen-Nowak
Email: JCohenNowak@kenyon.com
One Broadway
New York, NY 10004
Telephone:  212-908-6419

### <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of this document has been served on all counsel of record via the Court's electronic filing system on February 17, 2017.

*/s/Benjamin J. Setnick*